# In the United States Court of Appeals
# For the Tenth Circuit

_____

BRANDON PRYOR,

*Plaintiff-Appellee,*

v.

SCHOOL DISTRICT NO. 1, ALEX MARRERO, and ANTHONY SMITH,

*Defendants-Appellants.*

_____

**On Appeal from the United States District Court for the District of Colorado**
Civil Action No. 1: No. 22-CV-029886-JLK
The Honorable Judge John L. Kane

_____

**PLAINTIFF-APPELLEE'S RESPONSE BRIEF**
_____

MARI NEWMAN
ANDREW MCNULTY
KILLMER, LANE & NEWMAN, LLP
1543 Champa Street, Suite 400
Denver, CO 80202
(303) 571-1000
(303) 571-1001 fax
mnewman@kln-law.com
amcnulty@kln-law.com

*Attorneys for Plaintiff-Appellee*

**<u>ORAL ARGUMENT IS REQUESTED</u>**

# TABLE OF CONTENTS

PAGE NO.

**Statement Regarding Prior or Related Appeals** ........................................................v

**Table of Authorities** ........................................................................................vi

1. **Issues Presented** ...........................................................................................1

2. **Statement of Case** ........................................................................................1

   **2.1 Factual Background** ................................................................................1

   2.1.1  Mr. Pryor has a history of advocacy for racial equity for
   DPS Students ................................................................................1

   2.1.2  The STEAM Academy is created in 2019 ...........................................3

   2.1.3  The Fall 2020 interaction between Mr. Pryor and Assistant
   Superintendent Hudson cited by DPS – two years later – as
   justification for the Ban Letter ............................................................3

   2.1.4  The February 2021 interaction between Mr. Pryor and Director
   Mendez cited by DPS – 20 months later – as justification
   for the Ban Letter ............................................................................5

   2.1.5  Superintendent Marrero is hired by DPS in Spring 2021 .......................7

   2.1.6  Dr. Hudson retaliates against Mr. Pryor in the summer of 2021 and
   makes efforts to limit his role at the STEAM academy .........................7

   2.1.7  An independent investigation concludes in November of 2021
   that Mr. Pryor did not violate any DPS policies in his
   interactions with Dr. Hudson or others...............................................9

   2.1.8  Throughout 2021, Mr. Pryor criticizes Principal Lynch......................10

   2.1.9  Mr. Pryor has limited interactions with Dr. Hudson after
   the summer of 2021 ........................................................................11

ii

2.1.11 In the last summer and fall of 2022, Mr. Pryor continues to criticize DPS and its officials ...............................................................12

2.1.12 Ms. Lynch files an official complaint against Mr. Pryor in September 2022 because of his public criticisms ................................14

2.1.13 Throughout the fall of 20222, Mr. Pryor lodges ongoing criticisms about race-based disparities in DPS facilities and its exploitation of Black students ...............................................................15

2.1.14 DPS issues its Ban Letter against Mr. Pryor .......................................17

**2.2 Procedural History** .....................................................................................22

**3.  Summary of the Argument** .........................................................................23

**4.  Standard of Review** ....................................................................................27

**5.  Argument** ....................................................................................................28

**5.1 Appellants waived any argument that the injunction imposed by the District Court is a "disfavored" injunction** ...............................28

**5.2 The injunction imposed by the District Court is not a "disfavored" injunction** .............................................................................28

**5.3 The District Court did not abuse its discretion in concluding that Appellee has shown a substantial likelihood of success on the merits** ...........................................................30

5.3.1  The District Court correctly concluded that the First Amendment analysis applied to non-employee speech should be used to analyze Mr. Pryor's First Amendment claims ..................................................30

5.3.2 The District Court did not abuse its discretion by holding
that, even under the more stringent First Amendment
analysis applied to speech by public employees, Mr. Pryor
demonstrated a likelihood of success that Appellants
violated his First Amendment rights ...................................................32

  5.3.2.1    The District Court correctly found that Mr. Pryor's
advocacy was not made pursuant to his official duties ...............33

  5.3.2.2    The District Court correctly found that Mr. Pryor's advocacy
only addressed matters of significant public concern...................35

  5.3.2.3    The District Court correctly found that Appellants' interests in
regulating Mr. Pryor's speech do not outweigh Mr. Pryor's
interest in speaking ....................................................................37

  5.3.2.4    The District Court correctly found that Mr. Pryor's speech
was a motivating factor for Appellants' retaliatory actions ........40

  5.3.2.5    The District Court correctly found that Appellants would not
have retaliated against Mr. Pryor absent his advocacy.................41

5.3.3 Under the First Amendment analysis applied to speech by
non-employees, Mr. Pryor has shown a substantial likelihood
of success on the merits.......................................................................41

  5.3.3.1    Mr. Pryor was engaged in First Amendment protected
petitioning activity when he directly contacted DPS officials .....42

  5.3.3.2    Mr. Pryor was engaged in First Amendment protected free
speech activity when he criticized DPS and its officials,
and spoke out on issues related to DPS ........................................43

  5.3.3.3    Mr. Pryor engaged in his speech and petitioning activity
at public fora ................................................................................44

  5.3.3.4    Mr. Pryor provided ample evidence that Appellants took
action against him because of the viewpoint and content
of his speech and petitioning .......................................................46

5.3.3.5 Mr. Pryor demonstrated that the restrictions imposed on his speech were not narrowly tailored to a compelling government interest ........................................................... 47

5.3.3.6 Appellants' actions would chill a person of ordinary firmness from continuing to engage in First Amendment activity ............. 48

5.3.4 Appellants retaliated against Mr. Pryor in violation of his First Amendment rights ......................................................... 49

5.3.5 Appellants imposed an unconstitutional prior restraint on his speech under the test applied to non-employee speech ....................... 51

**5.4 The District Court did not err in concluding that Appellant would suffer an irreparable injury absent the issuance of an injunction** .................................................... 52

**5.5 The District Court did not err in concluding that the balance of equities weighed in favor of the issuance of an injunction** .................... 54

**5.6 The District Court did not err in concluding that the public interest is served by the issuance of an injunction** ................... 55

**5.7 The District Court's injunction specifically delineates what conduct is enjoined** .......................................................... 56

**6. Conclusion** ........................................................................... 64

**7. Statement Regarding Oral Argument** ....................................... 65

**8. Certificate of Compliance** ..................................................... 66

**9. Certificate of Service** ........................................................... 67

## <u>PRIOR OR RELATED APPEALS</u>

There are no prior or related appeals in this matter.

# TABLE OF AUTHORITIES

## US SUPREME COURT CASES

*Ashcroft v. American Civil Liberties Union,*
    535 U.S. 564 (2002) ....................................................................41

*Bd. of Cty. Comm'rs, Wabaunsee Cty., Kan. v. Umbehr,*
    518 U.S. 668 (1996) ....................................................................47

*Brown v. Board of Education of Topeka,*
    347 U.S. 483 (1954) ..............................................................55, 57

*Burson v. Freeman,*
    504 U.S. 191 (1992) ....................................................................43

*Carey v. Brown,*
    447 U.S. 455 (1980) ....................................................................46

*Carroll v. President & Comm'rs of Princess Anne,*
    393 U.S. 175 (1968) ....................................................................51

*City of Houston v. Hill,*
    482 U.S. 451 (1987) ....................................................................47

*Connick v. Myers,*
    461 U.S. 138 (1983) ...............................................23, 36, 37, 43

*Elrod v. Burns,*
    427 U.S. 347 (1976) ....................................................................52

*Forsyth Cty. v. Nationalist Movement,*
    505 U.S. 123; 112 S. Ct. 2395 (1992) .......................................47

*Hills v. Gautreaux,*
    425 U.S. 284 (1976) ....................................................................57

*Hutto v. Finney,*
    437 U.S. 678 (1978) ....................................................................57

*Int'l Socy'y for Krishna Consciousness v. Lee,*
    505 U.S. 672 (1992) .................................................................. 64

*Kennedy v. Bremerton Sch. Dist.,*
    142 S. Ct. 2407 (2022) ............................................................. 34

*Keyes v. Sch. Dist.,*
    413 U.S. 189; 93 S. Ct. 2686 (1973) ................................. 1, 62 n.6

*Lane v. Franks,*
    134 S. Ct. 2369 (2014) ......................................................... 32, 34

*Marbury v. Madison,*
    5 U.S. 137 (1803) .................................................................... 55

*McCullen v. Coakley,*
    573 U.S. 464 (2014) ................................................................ 51

*Milliken v. Bradley,*
    433 U.S. 267 (1977) ................................................................ 56

*Mt. Healthy City School District Board of Education v. Doyle,*
    429 U.S. 274 (1977) ........................................................... 40, 49

*Neb. Press Ass'n v. Stuart,*
    427 U.S. 539 (1976) ................................................................ 51

*Obergefell v. Hodges,*
    135 S. Ct. 2584 (2015) ............................................................ 52

*Packingham v. North Carolina,*
    137 S. Ct. 1730 (2017) ............................................................ 45

*Pickering v. Board of Education,*
    391 U.S. 563 (1968) ....................................................... 38, 41, 43

*R.A.V. v. City of St. Paul,*
    505 U.S. 377 (1992) ................................................................ 41

*Reed v. Town of Gilbert,*
    576 U.S. 155 (2015) .................................................................... 46

*Reno v. American Civil Liberties Union,*
    521 U.S. 844 (1997) .................................................................... 44

*Rutan v. Republican Party,*
    497 U.S. 62 (1990) ...................................................................... 48

*Snyder v. Phelps,*
    562 U.S. 443 (2011) .................................................................... 43

*Swann v. Charlotte-Mecklenburg Bd. of Educ.,*
    402 U.S. 1 (1971) ........................................................................ 57

*Terminiello v. Chicago,*
    337 U.S. 1 (1949) ........................................................................ 47

*Texas v. Johnson,*
    491 U.S. 397 (1989) .................................................................... 43

*United Mine Workers v. Ill. State Bar Ass'n,*
    389 U.S. 217 (1967) .................................................................... 42

*United States v. Cruikshank,*
    92 U.S. 542 (1875) ...................................................................... 42

*Waters v. Churchill,*
    114 S. Ct. 1878 (1994) ............................................................... 35

**FEDERAL CASES**

*AG of Okla. v. Tyson Foods, Inc.,*
    565 F.3d 769 (10th Cir. 2009) .................................................... 27

*Am. Atheists v. Rapert*, No. 4:19-cv-00017-KGB,
    2019 U.S. Dist. LEXIS 230493 (E.D. Ark. Sep. 30, 2019) ................. 45, 56

*American Civil Liberties Union v. Johnson,*
    194 F.3d 1149 (10th Cir. 1999) ................................................. 54

*Anderson v. Coors Brewing Co.,*
    181 F.3d 1171 (10th Cir. 1999).....................................................................50

*Awad v. Ziriax,*
    670 F.3d 1111 (10th Cir. 2012).........................................28, 52, 53, 54, 55

*Bart v. Telford,*
    677 F.2d 622 (7th Cir. 1982)........................................................................48

*Berger v. Battaglia,*
    779 F.2d 992 (4th Cir. 1985)................................................................36, 39

*Bible Believers v. Wayne Cty.,*
    805 F.3d 228 (6th Cir. 2015)........................................................................47

*Brammer-Hoelter v. Twin Peaks Charter Acad.,*
    602 F.3d 1175 (10th Cir. 2010)............................................................34, 37

*Brandt v. City of Westminster,*
    300 F. Supp. 3d 1259 (D. Colo. 2018).........................................................42

*Buker v. Howard Cty.*, No. MJG-13-3046,
    2015 U.S. Dist. LEXIS 68763 (D. Md. May 27, 2015)…………………..38

*Campagna v. Mass. Dep't of Envtl. Prot.,*
    334 F.3d 150 (1st Cir. 2003).........................................................................31

*CarePartners LLC v. Lashway,*
    545 F.3d 867 (9th Cir. 2008)........................................................................31

*Casey v. West Las Vegas Indep. Sch. Dist.,*
    473 F.3d 1323 (10th Cir. 2007)............................................................35, 37

*Cate v. Oldham,*
    707 F.2d 1176 (10th Cir. 1983).....................................................................55

*CF&I Steel Corp. v. United Mine Workers of America,*
    507 F.2d 170 (10th Cir. 1974).......................................................................58

*Clearone Communs., Inc. v. Chiang,*
670 F. Supp. 2d 1248 (D. Utah 2009)..........................................................61

*Cmty. for Creative Non-Violence v. Turner,*
714 F. Supp. 29 (D.D.C. 1989)....................................................................51

*Coleman v. Cerski,* No. 3:04-cv-1423
2007 U.S. Dist. LEXIS 74347 (M.D. Pa. Oct. 4, 2007)..............................31

*Davis v. Utah,*
2021 U.S. App. LEXIS 26554 (10th Cir. Sep. 2, 2021) ..............................34

*DeLoach v. Bevers,*
922 F.2d 618 (10th Cir. 1990)......................................................................50

*Dixon v. Kirkpatrick,*
553 F.3d 1294 (10th Cir. 2009)....................................................................37

*Doe v. Harris,*
772 F.3d 563 (9th Cir. 2014)........................................................................52

*Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.,*
269 F.3d 1149 (10th Cir. 2001)....................................................................52

*Drywall Tapers and Pointers, Local 1974 v. Local 530 of*
*Operative Plasterers and Cement Masons Int'l Ass'n,*
889 F.2d 389 (2d Cir. 1989).........................................................................58

*Duda v. Elder,*
7 F.4th 899 (10th Cir. 2021).................................................................37, 38

*Durham v. Jones,*
737 F.3d 291 (4th Cir. 2013)........................................................................36

*Eichenlaub v. Twp. of Indiana,*
385 F.3d 274 (3d Cir. 2004).........................................................................31

*Eisenhour v. Weber County,*
744 F.3d 1220 (10th Cir. 2014)....................................................................33

*Esparza v. Bowman,*
    523 F. App'x 530 (10th Cir. 2013) ............................................................. 50

*First Unitarian Church of Salt Lake City v. Salt Lake City Corp.,*
    308 F.3d 1114 (10th Cir. 2002) .................................................................. 64

*Flanagan v. Munger,*
    890 F.2d 1557 (10th Cir. 1989) .................................................................. 39

*Free the Nipple-Fort Collins v. City of Fort Collins,*
    916 F.3d 792 (10th Cir. 2019) ............................................................ *passim*

*Friedl v. City of New York,*
    210 F.3d 79 (2d Cir. 2000) ......................................................................... 31

*Gable v. Lewis,*
    201 F.3d 769 (6th Cir. 2000) ..................................................................... 32

*Gann v. Cline,*
    519 F.3d 1090 (10th Cir. 2008) .................................................................. 40

*Garcia v. City of Trenton,*
    348 F.3d 726 (8th Cir. 2003) ..................................................................... 48

*Gardetto v. Mason,*
    100 F.3d 803 (10th Cir. 1996) .................................................................... 37

*Grabow v. Indep. Sch. Dist.,* No. 95-6316
    1996 U.S. App. LEXIS 12373 (10th Cir. 1996) ....................................... 50

*Greene v. Doruff,*
    660 F.3d 975 (7th Cir. 2011) ..................................................................... 49

*Hernandez v. City of Phx.,*
    43 F.4th 966 (9th Cir. 2022) ...................................................................... 36

*Hyman v. Kirksey*, No. 3:18-cv-230-DPM,
    2019 U.S. Dist. LEXIS 90509 (E.D. Ark. May 30, 2019) ........................ 45

*Jenkins v. Rock Hill Local Sch. Dist.,*
    513 F.3d 580 (6th Cir. 2008).......................................................31

*Jews for Jesus v. Massachusetts Bay Transp. Auth.,*
    984 F.2d 1319 (1st. Cir. 1993)..................................................56

*Johnson v. Radford,*
    449 F.2d 115 (5th Cir. 1971).................................................58, 63

*Kennedy v. Tangipahoa Par. Library Bd. of Control,*
    224 F.3d 359 (5th Cir. 2000).....................................................37

*Keyes v. Sch. Dist. No. 1,*
    895 F.2d 659 (10th Cir. 1990)...................................................57

*Keyes v. Sch. Dist.,*
    303 F. Supp. 289 (D. Colo. 1969).........................................62 n.6

*Kikumura v. Hurley,*
    242 F.3d 950 (10th Cir. 2001)...................................................53

*Klen v. City of Loveland,*
    661 F.3d 498 (10th Cir. 2011)...................................................39

*Knight First Amendment Inst. at Columbia Univ. v. Trump,*
    928 F.3d 226 (2d Cir. 2019).......................................................45

*Knopf v. Williams,*
    884 F.3d 939 (10th Cir. 2018)...................................................33

*Liverman v. City of Petersburg,*
    844 F.3d 400 (4th Cir. 2016).................................................36, 44

*Locurto v. Giuliani,*
    447 F.3d 159 (2d Cir. 2006).......................................................36

*Lyons v. Jefferson Bank & Tr.,*
    994 F.2d 716 (10th Cir. 1993)...................................................28

*McCook v. Springer Sch. Dist.,*
44 F. App'x 896 (10th Cir. 2002) ................................................. 30

*Mesa v. White,*
197 F.3d 1041 (10th Cir. 1999) ................................................... 45

*Moonin v. Tice,*
868 F.3d 853 (9th Cir. 2017) ...................................................... 36

*Moore v. Kilgore,*
877 F.2d 364 (5th Cir. 1989) ...................................................... 37

*Moser v. Las Vegas Metropolitan Police Department,*
984 F.3d 900 (9th Cir. 2021) ...................................................... 35

*One Wis. Now v. Kremer,*
354 F. Supp. 3d 940 (W.D. Wis. 2019) ...................................... 45

*Pac. Frontier v. Pleasant Grove City,*
414 F.3d 1221 (10th Cir. 2005) ................................................... 55

*Peck v. McCann,*
43 F.4th 1116 (10th Cir. 2022) ................................................... 30

*Phillip v. Fairfield Univ.,*
118 F.3d 131 (2d Cir. 1997) ....................................................... 29

*Piscottano v. Town of Somers,*
396 F. Supp.2d 187 (D. Conn. 2005) ......................................... 45

*Prairie Band of Potawatomi Indians v. Pierce,*
253 F.3d 1234 (10th Cir. 2001) ........................................ 29, 58, 63

*Preston v. Thompson,*
589 F.2d 300 (7th Cir. 1978) ...................................................... 52

*Price v. City of New York*, No. 15 Civ. 5871 (KPF),
2018 WL 3117507 (S.D.N.Y. June 25, 2018) ............................ 45

*Quraishi v. St. Charles Cty.,*
 2021 U.S. App. LEXIS 2379 (8th Cir. 2021) .......................................50 n.5

*Ramirez v. Oklahoma Dep't of Mental Health,*
 41 F.3d 584 (10th Cir. 1994)....................................................................50

*Ramos v. Lamm,*
 639 F.2d 559 (10th Cir. 1980)...................................................................57

*Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ.,*
 595 F.3d 1126 (10th Cir. 2010)..................................................................34

*Reliance Ins. Co. v. Mast Constr. Co.,*
 159 F.3d 1311 (10th Cir. 1998)...........................................................58, 63

*Retiree, Inc. v. Anspach,*
 660 F. App'x 582 (10th Cir. 2016).............................................................58

*Richison v. Ernest Group, Inc.,*
 634 F.3d 1123 (10th Cir. 2011)..................................................................28

*Rock v. Levinski,*
 791 F.3d 1215 (10th Cir. 2015)..................................................................38

*Rock for Life-UMBC v. Hrabowski,*
 411 F. App'x 541 (4th Cir. 2010)...............................................................46

*RoDa Drilling Co. v. Siegal,*
 552 F.3d 1203 (10th Cir. 2009)..................................................................27

*Rohrbough v. Univ. of Colo. Hosp. Auth.,*
 596 F.3d 741 (10th Cir. 2010)............................................................33, 34

*Sanders v. Mountain Am. Credit Union,*
 621 F. App'x. 520 (10th Cir. 2015)............................................................54

*Santa Monica Food Not Bombs v. City of Santa Monica,*
 450 F.3d 1022 (9th Cir. 2006)....................................................................51

*Saulpaugh v. Monroe Cmty. Hosp.,*
    4 F.3d 134 (2d Cir. 1993)...........................................................36

*Scandia Down Corp. v. Euroquilt, Inc.,*
    772 F.2d 1423 (7th Cir. 1985).....................................58, 61, 63

*Schrier v. Univ. of Colo.,*
    427 F.3d 1253 (10th Cir. 2005)...............................................28

*Seamons v. Snow,*
    84 F.3d 1226 (10th Cir. 1996)..................................................40

*Seifert v. Unified Gov't of Wyandotte Cty.,*
    779 F.3d 1141 (10th Cir. 2015)................................................34

*Smith v. Plati,*
    258 F.3d 1167 (10th Cir. 2001)................................................48

*Summum v. Pleasant Grove City,*
    483 F.3d 1044 (10th Cir. 2007)................................................28

*Suppan v. Dadonna,*
    203 F.3d 228 (3d Cir. 2000)..............................................50 n.5

*Swanson v. Griffin,*
    2022 U.S. App. LEXIS 5179 (10th Cir. Feb. 25, 2022) ...........44

*Thomas S. v. Flaherty,*
    902 F.2d 250 (4th Cir. 1990)...................................................57

*Tobey v. Jones,*
    706 F.3d 379 (4th Cir. 2013)...................................................56

*Trant v. Oklahoma,*
    754 F.3d 1158 (10th Cir. 2014)...............................................37

*United States v. Meyers,*
    200 F.3d 715 (10th Cir. 2000)................................................53

*United States v. Odessa Union Warehouse Co-op,*
    833 F.2d 172 (9th Cir. 1987)......................................................57

*United States v. Reyes,*
    87 F.3d 676 (5th Cir. 1996).......................................................31

*United States v. Strandlof,*
    667 F.3d 1146 (10th Cir. 2012)..................................................41

*Utter v. Colclazier,*
    714 Fed. Appx. 872 (10th Cir. 2017)..........................................44

*Van Dam v. Town of Guernsey*, No. 20-CV-60-SWS,
    2021 U.S. Dist. LEXIS 87070 (D. Wyo. May 4, 2021)..............34

*Van Deelen v. Johnson,*
    497 F.3d 1151 (10th Cir. 2007)................................30, 42, 49, 50

*Verlo v. Martinez,*
    820 F.3d 1113 (10th Cir. 2016)..........................................52, 54

*Vickery v. Jones,*
    100 F.3d 1334 (7th Cir. 1996)....................................................31

*Williams v. United States,*
    402 F.2d 47 (10th Cir. 1967)......................................................58

*Winnebago Tribe of Neb. v. Stovall,*
    341 F.3d 1202 (10th Cir. 2003)..................................................27

*Worrell v. Henry,*
    219 F.3d 1197 (10th Cir. 2000)....................................30, 49, 50

**OTHER AUTHORITIES**

Chemerinsky, Erwin, *Constitutional Law: Principles and*
    *Policies* § 11.2.3.1, at 949-50 (3d ed. 2006) ............................51

Pascoe, Pat, *A Dream of Justice: The Story of Keyes v.*
    *Denver Public Schools* (2022) ......................................................1

1. **ISSUES PRESENTED**

Appellees agree with Appellants' listed issue presented on appeal, with the additional issue of whether Appellants waived any argument that the District Court's injunction was a "disfavored" injunction.

2. **STATEMENT OF THE CASE**

2.1 **Factual Background**

The District Court's factual findings are supported by the record below and certainly cannot be characterized as "lack[ing] a rational basis in the record." *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 796 (10th Cir. 2019). Those factual findings, and the evidence supporting them in the record, are outlined below.

2.1.1 **Mr. Pryor has a history of advocacy for racial equity for DPS students.**

Denver Public Schools ("DPS") has a long history of systemic racism and discrimination. Aplt.Appx.1973-2054; *see also* Pat Pascoe, *A Dream of Justice: The Story of Keyes v. Denver Public Schools* (2022); *Keyes v. Sch. Dist.*, 413 U.S. 189, 93 S. Ct. 2686 (1973); Aplt.Appx.1064-1071. Seeking to eradicate this living history, Mr. Pryor has advocated since 2017 for racial and education justice in DPS. Aplt.Appx.1058. Mr. Pryor is employed by Denver Metro Community Impact, where his work involves youth violence prevention. Aplt.Appx.392. He is a co-founder of several non-profits, including Warriors for High Quality Schools,

1

an education equity advocacy organization for the Black and Latinx population within DPS. Aplt.Appx.392-3. He has also been a volunteer coach for the Warriors regional football team in Far Northeast Denver under Coach Tony Lindsay. Aplt.Appx.393.

As a community member and volunteer, Mr. Pryor became aware of the various inequities within DPS that became the subjects of his First Amendment protected speech at issue in this case. Aplt.Appx.394-6. Mr. Pryor has advocated in his capacity of the Warriors for High Quality Schools to address these and other issues. Aplt.Appx.478. His advocacy has included speaking at DPS Board monthly public comment sessions; posting commentary and videos on Facebook critical of DPS and its Board; meeting with Board members, executives and school leaders; being present in schools advocating for change; building relationships with faculty and students; speaking critically about DPS and its Board at community meetings; speaking against a Board member on the Brother Jeff show (a local Black news outlet); and making T-shirts expressing opposition to a Board member. Aplt.Appx.396-403,1889-1918. He pressed DPS to provide libraries, improved weight room facilities, and lights on the athletic fields in Far Northeast Denver. *Id.* He took up issues such as teachers coaching at schools other than where they teach because of his concern it would take students out of the community and reduce local school funding. *Id.* Mr. Pryor pushed DPS to reopen

Montbello High School in Far Northeast Denver. Aplt.Appx.413. He helped form Our Voice Our Schools, a community collective of people who had had enough of racism, oppression, discrimination against Black people and Brown people inside the school district. *Id.* He called out DPS employees who he perceived as making decisions that were harmful to Black and Brown students and educators. Aplt.Appx.398-403.

### 2.1.2 **The STEAM Academy is created in 2019.**

In 2019, Mr. Pryor and others sought and received DPS approval for creation of the Robert S. Smith STEAM Academy (the "STEAM Academy"), a high school modeled after Historically Black Colleges and Universities. Aplt.Appx.416-7,2062-71. In November 2020, the DPS Board decided to house the STEAM Academy along with Montbello Career and Technical High School in an office building in Far Northeast Denver while the Board searched for a long-term facility placement. Aplt.Appx.426,2055-56.

### 2.1.3 **The Fall 2020 interaction between Mr. Pryor and Assistant Superintendent Hudson cited by DPS – two years later – as justification for the Ban Letter.**

In the fall of 2020, the STEAM Academy was in its planning year and was preparing to receive students the following fall. Aplt.Appx.2164. Mr. Pryor was involved in the planning, and the principal of the school did not agree with a number of his suggestions. *Id.* As a result, the principal's supervisor, Dr.

Antoinette Hudson,[1] the Regional Instructional Superintendent for the Far Northeast Region, reached out to Mr. Pryor. *Id.* Mr. Pryor called Dr. Hudson on October 23, 2020. *Id.* The call began as a productive conversation but became heated. Aplt.Appx.2164-66. Dr. Hudson reported to DPS that Mr. Pryor stated on the call: "[L]et me be clear, I never wanted you, if you do anything to retaliate against me, there will be problems." *Id*. She also recalled him becoming irate and yelling "[s]tay the fuck away from me" and "[d]on't mess with my money." Aplt.Appx.2183. Later, Dr. Hudson and Mr. Pryor attended an event at Dr. Martin Luther King, Jr. Early College. Dr. Hudson requested that DPS security escort her at the event. Aplt.Appx.1105-08,2164-66. Their only interaction there was when Mr. Pryor greeted Dr. Hudson with an elbow bump. *Id.* As they were leaving, Dr. Hudson and Mr. Pryor exchanged text messages, and Mr. Pryor demanded "to be at the table for EVERYTHING" related to the STEAM Academy. Aplt.Appx.2164-66,2186. Mr. Pryor wrote: "If retaliation comes from you, you will have a problem" is no threat..... IT IS A PROMISE..... **That problem will be a legal one**. You are no longer invited to work with me or our school. You have contributed nothing to this point so you have zero skin in the game so it should be easy for you to "step off" NOBODY WANTS YOU INVOLVED. So why would

---

[1] Notably, Dr. Hudson failed to answer so many questions directly during her testimony at the preliminary injunction hearing that the District Court judge nearly struck the entirety of her testimony. Aplt.Appx.1286.

you want to be. Is it your it your [sic] ego or your hunger for control/ power trip? Either way you won't be working with us moving forward. I will see to it that your boss informs you expeditiously. Aplt.Appx.2164-66,2190 (emphasis added). Mr. Pryor ended the conversation with "Kiss my ass." Aplt.Appx.2164-66.

Dr. Hudson did not take Mr. Pryor's text messages to her as threatening or harassing. Aplt.Appx.1222-27. At that time, Dr. Hudson did not file a complaint with DPS based on Mr. Pryor's conduct. *Id.*, Aplt.Appx.1221. Between October of 2020 and August of 2021 (when Mr. Pryor was again critical of Dr. Hudson), Mr. Pryor and Dr. Hudson had numerous interactions that did not involve Mr. Pryor criticizing Dr. Hudson, and Dr. Hudson did not report any issues with those interactions. Aplt.Appx.1009-10,2101. Dr. Hudson testified that Mr. Pryor did not mistreat Dr. Hudson during any interactions following October 23, 2020. Aplt.Appx.1281.

> 2.1.4 **The February 2021 interaction between Mr. Pryor and Director Mendez cited by DPS – 20 months later – as justification for the Ban Letter.**

DPS students engage in a choice process allowing them to rank local schools they wish to attend from a list of nearby schools provided by DPS based on address, but during the STEAM Academy's opening year DPS misidentified the school's address on the choice application so that when parents in Far Northeast Denver entered their addresses in the application, the STEAM Academy

did not show up as a nearby option for enrollment. Aplt.Appx.451-2,2116-17. Mr. Pryor was very upset about the error, which was significant because it was the STEAM Academy's first year enrolling students, and its funding was to depend on the number of students who enrolled. Aplt.Appx.486-7,564-5,1186-87,925. The DPS Executive Director of Enrollment and Campus Planning was Elizabeth Mendez. *Id*. On February 16, 2021, during a meeting over Zoom, Mr. Pryor criticized Ms. Mendez and her team for their error, using "strong tone and language." Aplt.Appx.453,1174-75,1196,2117. Later, parents notified Mr. Pryor that they had received calls from DPS employees questioning whether they wanted to enroll their children in the STEAM Academy and encouraging them to change their decisions. Aplt.Appx. 453-5,487-8,1198,2117. Mr. Pryor emailed Ms. Mendez about these reports, Aplt.Appx.2057, but she did not respond, Aplt.Appx.1201-02,2117. Mr. Pryor also used Facebook Live to highlight the mistakes of Ms. Mendez and her team. *Id*.

Ms. Mendez later reported that she believed Mr. Pryor had engaged in unprofessional conduct during the February 16 Zoom meeting, Aplt.Appx.2115-18, but made clear to DPS investigators that Mr. Pryor had not threatened her and that his "behavior was more threatening from a reputation or harassing nature rather than physical." Aplt.Appx.1203-04,2117,1114. DPS employee Dana Risch investigated Ms. Mendez's allegations, and concluded that, while there was no

evidence Mr. Pryor violated DPS policy by engaging in discriminatory conduct, his "behavior is not professional in nature" and "is inconsistent with the district's commitment to providing all employees to [sic] a respectful and inclusive work environment." Aplt.Appx.113 Mr. Pryor was not interviewed during the investigation because he is a community member, not a DPS employee. *Id.* In fact, he was not even made aware of the complaint until October 2022, when DPS issued its Ban Letter, discussed below. Aplt.Appx.489-90.

### 2.1.5 Superintendent Marrero is hired by DPS in Spring 2021.

When Superintendent Marrero applied for his position with DPS in the spring of 2021, Mr. Pryor backed another candidate who was familiar with the city and had a track record of raising scores of Black and Brown students, and advocated against Marrero because he was not from Denver, didn't understand the history of racism, and came from much smaller district. Aplt.Appx.417-8,883. Mr. Pryor called Board members and spoke out on Facebook and on the Brother Jeff show. Aplt.Appx.418-9. After Superintendent Marrero was selected by the Board, he reached out to Mr. Pryor. Aplt.Appx.419,883-4. Mr. Pryor and Mr. Marrero eventually developed a working relationship, with Mr. Pryor becoming supportive of Mr. Marrero for a period of time. Aplt.Appx.421, 2078,890,910.

### 2.1.6 Dr. Hudson retaliates against Mr. Pryor in the summer of 2021 and makes efforts to limit his role at the STEAM academy.

Near the end of the summer of 2021, the STEAM Academy began educating students. Aplt.Appx.2103. Mr. Pryor was specifically prevented from entering the building by Dr. Hudson, ostensibly because of COVID restrictions during the school's inauguration. Aplt.Appx. 1113,2103. Because other institutional superintendents were allowed on campuses, Mr. Pryor perceived this restriction as retaliation and an effort to block his ability to made decisions for the school he had helped found. Aplt.Appx.496-8. Mr. Pryor spoke with Superintendent Marrero, who told Mr. Pryor that he should have access to the school. Aplt.Appx.569,2103,1113. Mr. Pryor then called Dr. Hudson on August 21, 2021, and another heated conversation ensued. *Id.*; Aplt.Appx.2103. Mr. Pryor told Ms. Hudson that he "needed to have access to the school anytime he wanted… to be able to ensure that the school and how it was operating were up to his standards." Aplt.Appx.2103. In direct contradiction with information provided by the Superintendent, Ms. Hudson claimed it was District policy to restrict his access to the school. *Id.* Frustrated, Mr. Pryor responded by telling Ms. Hudson to "stay the fuck away from my school"; "You need to be fired"; "I'm going to make sure that you're fired"; and "If you come after me, I'm coming after you." Aplt.Appx.497-8,2103. Notably, Mr. Pryor only threatened Dr. Hudson's job. Aplt.Appx.1229-30,1268,1285. Mr. Pryor also posted a message to his personal Facebook page calling for Ms. Hudson's termination. Aplt.Appx.2103.

### 2.1.7 **An independent investigation concludes in November of 2021 that Mr. Pryor did not violate any DPS policies in his interactions with Dr. Hudson or others.**

Dr. Hudson later filed a formal complaint with DPS regarding that call and included her October 23, 2020 and August 26, 2021 interactions with Mr. Pryor in the complaint. Aplt.Appx.2103-04,2174-75. That complaint led to an investigation, which included Mr. Pryor's interactions with Ms. Mendez in February of 2021. Aplt.Appx.2102-2111. During the investigation, Dr. Hudson emailed the investigator to complain about Mr. Pryor mentioning her name, and other DPS officials' names, during news interviews. Aplt.Appx.2172-73. The investigation found that Mr. Pryor had not violated DPS's policies in any of his interactions with Ms. Hudson or other DPS employees. Aplt.Appx.2097-2111. In her complaint, Dr. Hudson also complained about Mr. Pryor's comments on a local politics show. Aplt.Appx.1288. The report found that Mr. Pryor's comments on the local politics show were not harassing toward Dr. Hudson, and that they were his political opinions which he was free to express. Aplt.Appx.2108-11.

Importantly, the report also found (and Dr. Hudson testified) that Dr. Hudson was not Mr. Pryor's supervisor, Aplt.Appx.1232-33,1259-60,1289-90, and Dr. Hudson acknowledged that Mr. Pryor is a community member, not an employee of DPS. Aplt.Appx.1232-33. As a result of the investigation, DPS drafted a letter stating that Mr. Pryor's access to the STEAM Academy was

restricted. Aplt.Appx.2119-21. However, Mr. Pryor did not receive this letter and his access to the STEAM Academy was never restricted based on the letter. Aplt.Appx.498-501. Because he was not an employee, he did not have a key badge, so nothing was taken away from him. *Id.*

At some point in the same time period wherein Dr. Hudson filed a report against Mr. Pryor, she encouraged the principal of the STEAM Academy to file a report against Mr. Pryor. Aplt.Appx.1254-55. However, the principal of the STEAM Academy refused to do so because she never felt threatened or unsafe because of Mr. Pryor. Aplt.Appx.1257-58.

### 2.1.8 Throughout 2021, Mr. Pryor criticizes Principal Lynch.

In 2021, DPS voted to reopen Montbello High School and hired principal Neisa Lynch, who Mr. Pryor identified as acting in a way that harmed students. Aplt.Appx.425. Principal Lynch began her tenure by firing Tony Lindsay, a Black man and the first and only had football coach to win a Colorado state championship. Aplt.Appx.425. She then terminated the nationally recognized librarian of the Montbello campus, a Black woman who had been instrumental in advocating for a library facility. Aplt.Appx.437. Ms. Lynch also fired another office staff member who was a Black woman, making it look as though she was getting rid of all of the Black women in the school. Aplt.Appx.513-4. Mr. Pryor criticized Ms. Lynch's personnel decisions on Facebook, on the Brother

Jeff Show, and with Board members and others. Aplt.Appx.425, 436,1900-03,1889-1918,706. Ms. Lynch "expressed concern through email to District leaders" afterwards. Aplt.Appx.2125. In February 2022, Mr. Pryor posted on Facebook that Ms. Lynch, Damian Brown (the school's new athletic director), and the new football coach "ALL NEED TO BE FIRED ASAP." Aplt.Appx.1905. Ms. Lynch never contacted Mr. Pryor about his posts, but instead complained directly to DPS. Aplt.Appx.572. Mr. Brown likewise responded to Mr. Pryor's Facebook posts with a formal complaint that "Mr. Pryor has been on social media harassing the staff of Montbello High School, calling for them to be fired and telling community not to enroll in the school." Aplt.Appx.2202. Interestingly, when he was later interviewed by a DPS employee regarding this issue, Mr. Pryor was under the impression that it was *Ms. Lynch* who was being investigated. Aplt.Appx.513-4.

### 2.1.9 Mr. Pryor has limited interactions with Dr. Hudson after the summer of 2021.

During the only interaction that Dr. Hudson had with Mr. Pryor at the STEAM Academy, in March of 2022, Mr. Pryor asked Dr. Hudson and her colleague a question and was completely appropriate. Aplt.Appx.1286-87. Mr. Pryor did not engage in any behavior that could have been considered threatening in any way. Aplt.Appx.1286-87.

### 2.1.10 **In July of 2022, Superintendent Marrero marginalizes Mr. Pryor.**

Deputy Tony Smith started in his position in July 2022. Aplt.Appx.769. Superintendent Marrero then began referring Mr. Pryor to Deputy Smith. Aplt.Appx.893. Deputy Smith was friends with both Ms. Lynch and Mr. Brown, and Mr. Pryor believed cronyism would prevent Deputy Smith from fairly considering his complaints, leading Mr. Pryor to publicly express his mistrust for Mr. Smith. Aplt.Appx.422-24,1123-24,831. Notably, Deputy Smith advised Mr. Pryor that Superintendent Marrero wanted Mr. Pryor to be quiet, and that he didn't want light shined on what was happening in the Far Northeast. Aplt.Appx.428-9.

### 2.1.11 **In the last summer and fall of 2022, Mr. Pryor continues to criticize DPS and its officials.**

In August 2022, Mr. Pryor made critical posts and live videos on Facebook regarding an event in which he believed malfeasance by DPS officials caused the Far Northeast Warriors junior varsity ("JV") football team to miss out on a home game that was particularly important to the students and community. Alt.Appx.440-442,1906-7,2215,2218-19. After Mr. Pryor's complaints to Tory Smith and Alex Marrero went unanswered, he used his Facebook page to inform the community about this incident, including specific critical posts about Mr. Brown, Ms. Lynch, and her husband, an employee at Westminster Public Schools. Aplt.Appx.508-9,1889-90,1906-1911,1917. Although it later investigated

*Mr. Pryor for raising these concerns*, DPS never investigated the issues Mr. Pryor raised. Aplt.Appx.573,578-9.

Mr. Pryor also raised his concerns that the STEAM Academy facility was inequitable with Deputy Smith, who dismissively advised Mr. Pryor that the STEAM Academy must satisfy certain criteria if it wanted to grow and obtain a new facility. Aplt.Appx.427-8,775-8. These criteria were not enumerated in the 2020 resolution passed by the Board stating that it would continue to search for a long-term facility for the STEAM Academy. Aplt.Appx.428,2055-56. Mr. Smith was aware that Mr. Pryor publicly called for his termination on Facebook, on the Brother Jeff Show, and elsewhere. Aplt.Appx.797-99,801-3. Superintendent Marrero was likewise aware of Mr. Pryor's criticisms of DPS and its personnel on social media. Aplt.Appx.903-4.

In September 2022, Mr. Pryor appeared in the news discussing the inadequacies of the STEAM Academy's facilities, including that students were not provided with a hot lunch. Aplt.Appx.448. DPS's Deputy Superintendent of Operations, James Carpenter, appeared in the same news segment, and Mr. Pryor later condemned Mr. Carpenter on Facebook for his comments. Aplt.Appx.448,1918. Mr. Pryor also made a series of Facebook posts criticizing DPS, Superintendent Marrero, Deputy Smith, and others. Specifically, he discussed DPS's actions in:

- Failing to provide appropriate facilities and an athletic program for the STEAM Academy, Aplt.Appx.4478,1916;

- Trademarking the Know Justice Know Peace podcast created by Black female students at DPS, Aplt.Appx.445-6,1914;

- Placing a disproportionate number of Black male students in affective needs centers and special education, Aplt.Appx.445,1910,905; and

- Discriminating against Black students and educators in other ways. Aplt.Appx.1909-11,1915.

### 2.1.12 Ms. Lynch files an official complaint against Mr. Pryor in September 2022 because of his public criticisms.

Citing Mr. Pryor's Facebook posts and speech on the Brother Jeff show, Ms. Lynch complained to DPS in September of 2022 that Mr. Pryor had subjected her to harassment, defamation, and slander and that he had intimidated and threatened her and her husband. Aplt.Appx.2176-77,2122-2127,726-9. Ms. Lynch's allegations were investigated by Ms. Risch, whose Investigation Report included a section describing the Facebook posts by Mr. Pryor. Aplt.Appx.2122-25. Ms. Lynch did not allege any inappropriate in-person contact with Mr. Pryor, and when asked at the hearing to point to the threats in Mr. Pryor's Facebook posts, she identified only the post about her husband, saying that it was threatening to his career and his reputation as an educator, and to her career and reputation. Aplt.Appx.727,1085-86.

Mr. Pryor was interviewed as a part of Ms. Risch's investigation this time around, and he explained that he felt there was "no accountability but meanwhile

everyone is tracking to see what [he] is doing wrong." Aplt.Appx.2125. Based

solely on the Facebook posts, Ms. Risch found Ms. Lynch's "allegations of

harassment to be credible in nature." Aplt.Appx.2126. Ms. Risch concluded

Mr. Pryor's conduct was "inconsistent with the District's commitment to

providing all employees to [sic] a respectful and inclusive work environment." *Id*.

DPS never investigated any of the concerns raised by Mr. Pryor about the conduct

of Ms. Lynch, Dr. Hudson, or Ms. Mendez to determine whether his complaints

about corruption within DPS were legitimate. Aplt.Appx.1081-

84,1092,1094,1102-03,1111,1114-16,1118.

> ### 2.1.13 **Throughout the fall of 20222, Mr. Pryor lodges ongoing criticisms about race-based disparities in DPS facilities and its exploitation of Black students.**

On October 12, 2022, Mr. Pryor attended a Board work session at which

DPS employees presented a proposal to close the Montbello Career and Technical

High School to provide more space for the STEAM Academy in their shared

building. Aplt.Appx.450-51,1958-62. Following the meeting, Mr. Pryor

confronted Mr. Carpenter and Ms. Mendez regarding his frustration with DPS's

continued failure to provide an adequate facility, and particularly their reliance on

low enrollment as justification, since the low enrollment was caused by both Ms.

Mendez's error regarding the school's address and because DPS was continuing to

handicap STEAM's growth in 2022 by wait-listing students who wished to attend.

Aplt.Appx.455-7,565-6,520-21,1963. Mr. Pryor had not seen Ms. Mendez since the February 2021 Zoom meeting. Aplt.Appx.520-21. He again stated that she should be fired and that Mr. Carpenter's tone on the news piece was racist. *Id.*; Aplt.Appx.458. During their conversation, a DPS security guard came out and stood next to Mr. Pryor as he spoke. Aplt.Appx. 457,519-20,1212,1963. Mr. Pryor spoke passionately and used his hands. *Id.* But Ms. Mendez and Mr. Carpenter stayed and listened, and both testified at the hearing that they did not feel threatened. Aplt.Appx.1023-25,1027,1037-39,1183-84,1211,1212. Mr. Carpenter asked Mr. Pryor during the encounter why Mr. Pryor came in there and "attack[ed]" them. Aplt.Appx.522. Mr. Pryor explained that the word "attack" is a specific word white folks like to use in describing Black people who are trying to have a conversation and, as he left the building, he remarked "kiss my ass." *Id.* Mr. Carpenter later admitted at the preliminary injunction hearing that Mr. Pryor did not "attack" anyone on October 12, 2022. Aplt.Appx.1038-39.

After the meeting, Mr. Pryor called Mr. Smith to discuss DPS's disparate treatment of the STEAM Academy as compared with Denver School of the Arts, which was not required to meet similar requirements before DPS spent $40 million on its new facility. Aplt.Appx.459,804. During the heated conversation, Smith complained that it was hurtful to him when Mr. Pryor called him a sell-out on Facebook because of Mr. Pryor's large voice in Denver's Black community,

and how he would mend the harm done to his reputation by the posts and on the Brother Jeff show. *Id.*,808.

On October 17, 2022, Mr. Pryor and a group of activists appeared at DPS headquarters for a Board public comment session. Aplt.Appx.462-5,1965-68,811,915-18. The group raised concerns about DPS's trademark of the Know Justice, Know Peace podcast; the closing of the American Indian Academy of Denver; DPS's failure to find a long-term facility for the STEAM Academy; and its recommendation to close Montbello Career and Technical High School; and specifically called out Superintendent Marerro. *Id.*

### 2.1.14 DPS issues its Ban Letter against Mr. Pryor.

The following day, October 18, 2022, Superintendent Marrero issued a DPS Community Update responding to the concerns raised at the public comment session the day before. Aplt.Appx.1941-44,918-22. That same day, DPS General Counsel Aaron Thompson wrote Mr. Pryor a letter (the "Ban Letter") – delivered to Mr. Pryor's home by two armed police officers –characterizing Mr. Pryor's free speech activity as a "pattern of threatening and bullying behavior" and imposing restrictions on his access to DPS facilities and ability to volunteer coach. Aplt.Appx.466-7,2128-2135. Superintendent Marerro is the sole person in charge of making all operational decisions for the entire district. Aplt.Appx.875-6.

Mr. Thompson testified that the formal complaint by Ms. Lynch and resulting Investigation Report were the "catalyst" for the letter, Aplt.Appx.990-96,1085, and that part of the basis for issuing the Ban Letter was to make sure that DPS employees could no longer be "attacked" by Mr. Pryor's advocacy. Aplt.Appx.995. The Ban Letter was based on Mr. Pryor's history of calling for the "dismissal or resignation" of DPS officials and "calling them names[.]" Aplt.Appx.1057. Importantly, Mr. Thompson testified that no student at the STEAM Academy ever raised complaints about Mr. Pryor. Aplt.Appx.1101. Mr. Thompson called the Ban Letter an "extreme measure[.]" Aplt.Appx.1131-32.

The Ban Letter claims Mr. Pryor violated DPS Policies KFA, KI, and G, but it does not discuss these policies. Aplt.Appx.2128. To implement Policy KFA, DPS Regulation KFA-R was developed. *See* Aplt.Appx.2128 2094. Regulation KFA-R specifies that "[u]nder no circumstances should letters of restriction to schools be used in place of conflict resolution or to retaliate against a parent/legal guardian." *Id*. But contrary to DPS policy, DPS did not engage in any conflict resolution prior to issuing the Ban Letter. Aplt.Appx.572-3,1129-31. Superintendent Marrero was unaware of anyone from DPS attempting to reach out to Mr. Pryor in an attempt to engage in conflict resolution conversations before issuing the Ban Letter. Aplt.Appx.930-31.

The second policy, Policy KI, informs that: "Visiting a school is a privilege, not a right, which may be limited, denied or revoked by a school administrator or designee based on considerations of student and/or staff safety, efficient school operations, maintenance of a proper educational environment, or failure to comply with th[e] policy." Aplt.Appx.2096. The Ban Letter recounts the allegations of Ms. Lynch, Dr. Hudson, and Ms. Mendez regarding Mr. Pryor, and repeatedly references Facebook posts by Mr. Pryor and videos in which he appeared. Aplt.Appx.2129-34.

Mr. Thompson testified that he also considered other alleged email complaints received by DPS employees that are not mentioned in the letter. Aplt.Appx.990-1009. In October 2021, a parent emailed the Commissioner of the Colorado High School Activities Association falsely accusing Mr. Pryor of having felony convictions and claiming that Mr. Pryor was cursing in front of students. Aplt.Appx.2169. In April 2022, a "concerned DPS parent" emailed the principal of the STEAM Academy, copying Dr. Hudson and Superintendent Marrero, claiming that Mr. Pryor was making threats on the Internet and referring to people as "white girl" and "white boy." Aplt.Appx.2243. Dr. Hudson forwarded this email to DPS's former General Counsel, among others, asserting that Mr. Pryor "ha[d] clearly threatened harm to this parent" – even though no such threat was reported in the email of the alleged "concerned DPS parent." *Id.*

Ultimately, however, the only incident outlined in the Ban Letter that occurred on DPS property was the incident with Dr. Hudson outlined above. Aplt.Appx.1057.

The Ban Letter prohibited Mr. Pryor from attending DPS Board meetings or public comment sessions in person and banned him from DPS property, except during public events and in his capacity as a parent. Aplt.Appx.2128-35,926-7. The letter advises: "[Y]ou are hereby prohibited from entering or remaining on any District property (except as noted in the following paragraph)." … "The only exception to the complete and total ban from District properties is to access, in your capacity as a parent, the campuses of: [his children's schools]; and to attend events open to the general public." Aplt.Appx.2128. The Ban Letter restricts Mr. Pryor from accessing STEAM Academy property, even though none of the incidents outlined in the Ban Letter occurred there, Aplt.Appx.1136, and there was no evidence that Mr. Pryor created an unsafe environment for students at the STEAM Academy. Aplt.Appx.1139.

The Ban Letter also revoked Mr. Pryor's permission to volunteer as a DPS coach or in any other capacity, causing him to miss the last two games of the season for seniors he had been coaching since they were in sixth grade. Aplt.Appx.468,2128-35. The letter states that Mr. Pryor's criminal history, including his misdemeanor assault charges in Colorado and "felony convictions in Texas" (which is false), make him ineligible for volunteer and coaching

opportunities, and new DPS leadership had determined to no longer allow him an exception,[2] Aplt.Appx.2128-35. However, Mr. Pryor's Texas felony case resulted in no conviction, Aplt.Appx.1296-97,2159 (documenting disposition on the charges was "deferred adjudication"), and DPS was well aware of Mr. Pryor's previous misdemeanor charges, which occurred in 2014, but he was not banned from coaching prior to the issuance of the Ban Letter. Aplt.Appx.1296-98.

Finally, the Ban Letter informed Mr. Pryor that he could file an appeal within 30 days, which Mr. Pryor did on October 26, 2022, raising the arguments he advances in this case. Aplt.Appx.2134-2149. Six days after this case was filed, DPS Deputy Chief of Staff, Deborah Staten, responded to Mr. Pryor's appeal, removing the restrictions on his attendance at DPS Board meetings and his participation in public comment sessions in person, but upholding the other restrictions. Aplt.Appx.2150-51. In addition to the Ban Letter, DPS sent an email to parents and students at the STEAM Academy notifying them that Mr. Pryor would no longer be allowed to access the building. Aplt.Appx.1939-40,941.

Jennifer Holladay, a longtime DPS Cabinet member (under three Superintendents) who had worked closely with Mr. Pryor between 2013-2021,

---

[2] Under a previous superintendent, Mr. Pryor's history was carefully vetted and, in conjunction with a recognition of the negative impact of DPS's policy on Black and Brown men, he was allowed to coach. Aplt.Appx.599-601.

stated during the preliminary injunction hearing that DPS's ban of Mr. Pryor was contrary to DPS's policy mandating conflict resolution before the extreme step that must only be taken as a last resort. Aplt.Appx.587. Ms. Holladay was so troubled by DPS's decision to ban one of its most vocal long-standing and effective community activists that she emailed the Board and Superintendent. Aplt.Appx.273,592-3,612-13,1972. Notably, Ms. Holladay was sometimes a target of Mr. Pryor's public criticisms, but never felt intimidated nor filed any complaints with DPS, and indeed credits his advocacy as having caused many positive changes at DPS. Aplt.Appx.590,601-5,615-17.

DPS's conduct caused Mr. Pryor significant emotional distress and reputational injury, and chilled his First Amendment activity. Aplt.Appx.467-70,548-54,560-61.

### 2.2 **Procedural History**

Mr. Pryor filed this case on November 3, 2022. Aplt.Appx.13-33. In his first claim for relief, he asserted that Defendants violated his First Amendment rights. Aplt.Appx.29-30. Mr. Pryor subsequently filed a motion for preliminary injunction, focusing solely on his first claim and the violation of his First Amendment rights. Aplt.Appx.34-42. After additional briefing, Aplt.Appx.47-71,190-217, and a seven-day preliminary injunction hearing, Aplt.Appx.375-1306, the District Court issued an order preliminarily enjoining Defendants from

enforcing the Ban Letter against Mr. Pryor or taking any other retaliatory action against Mr. Pryor, his family, or the STEAM Academy (the "Order"). Aplt.Appx.1307-1339. The Order held that Mr. Pryor had shown a likelihood of success on the merits of his First Amendment claim, irreparable harm absent an injunction, that the balance of equities favored issuance of an injunction, and that the public interest was served by an injunction. *Id.*

## 3. **SUMMARY OF THE ARGUMENT**

Brandon Pryor has been a strong advocate for educational justice at DPS, as co-founder of a DPS school, a volunteer football coach, and a vocal advocate for the rights of minority students. As the District Court properly recognized:

> Mr. Pryor's free speech interest is weighty. "[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." Mr. Pryor is fighting to end DPS's long history of discrimination.

Aplt.Appx.1329 (quoting *Connick v. Myers*, 461 U.S. 138, 145 (1983)).

Appellants retaliated against Mr. Pryor for his constitutionally protected speech through imposition of an unconstitutional prior restraint on his speech while justifying the retaliation and restraint with the types of accusations of incivility "that have long been used as tools of discrimination and to silence opposition." Aplt.Appx.1332. Appellants continue to rely on these same offensive arguments in an attempt to revive their effort to silence Mr. Pryor's First Amendment protected speech. Not only does silencing Mr. Pryor cause him

irreparable harm, but Appellants efforts to stifle his advocacy and violate his First Amendment rights harm the public as well.

Appellants claim that the District Court abused its discretion and minimized their articulated concerns by finding that the violation of Mr. Pryor's First Amendment rights outweighed any interest that Appellants had in enforcing an administrative order that unconstitutionally banned Mr. Pryor from engaging in further advocacy. The opposite is true. The District Court went out of its way to analyze the issues in the manner most deferential to Appellants' concerns, explicitly applying "the more stringent standard preferred by the Appellants" as though Mr. Pryor were a DPS employee rather than the unpaid volunteer that he is. Aplt.Appx.1328. But even under the more stringent *Garcetti/Pickering* test, which is reserved for cases involving public employees' speech, the District Court appropriately determined that (1) nothing in the ample record supported the conclusion that Mr. Pryor's speech at issue in the case was made pursuant to any official duties he had as a DPS volunteer; Aplt.Appx.1328-29, (2) that "Mr. Pryor's relevant speech was undoubtedly on matters of public concern because it was directed at revealing official shortcomings in the public school system and pushing administrators to do better"; Aplt.Appx.1329-30, (3) that Mr. Pryor's weighty free speech interests outweigh DPS's interest as an employer;

Aplt.Appx.1330-34, and (4) that Mr. Pryor's speech was a motivating factor" in Appellants' treatment of him. Aplt.Appx.1334.

Throughout their brief, Appellants revert to their failed arguments that Mr. Pryor's speech must be stifled because he is seeking to hold Appellants accountable to the community in ways that make them uncomfortable. Appellants continue to insist that Mr. Pryor's protected speech is "threatening," even as its own witnesses conceded that "Mr. Pryor's speech could only be construed as threatening the **jobs** of public employees." Aplt.Appx.1085-87,1331 (emphasis added). Appellants try to curtail Mr. Pryor's protected speech by characterizing his critical Facebook posts as "harassing" and "threatening," despite their own witnesses' testimony that the only "threat" was to **professional** **reputation**. Aplt.Appx.1317-18.

But the District Court was deliberate in its evaluation of Mr. Pryor's *actual* speech – directed at "fighting to end DPS's long history of discrimination," and "advocat[ing] for DPS students and for changes he thought would lead to progress," Aplt.Appx.1333 – as opposed to Appellants' hurt feelings about being publicly criticized by, and appropriately found that the fundamental importance of allowing such protected speech outweighed DPS's interests in silencing it.

As to Appellants' motivation for restricting Mr. Pryor's speech, the District Court correctly determined that "[t]here can be little doubt that this is the case

based on the present record." Aplt.Appx.1334. Indeed, Appellants explicitly pointed to Mr. Pryor's speech on these issues of public concern – "posts regarding the hiring of school staff, the perceived need for school employees to resign or be terminated, the possibility that a school football team had their game purposefully stolen, the inadequacy of the STEAM Academy's facility, and other sensed mistreatment of the community" – as the justifications for their restrictions on him in the Ban Letter. Aplt.Appx.1329. Based on the ample evidence before it, including seven days of sworn testimony from witnesses on both sides, the District Court carefully analyzed – and explicitly rejected – Appellants' alternative articulated reasoning, finding that "the restrictions contained in the Ban Letter are likely the result of improper retaliation." Aplt.Appx.1336.

Ultimately, Appellants' appeal is premised on the same problematic tone policing that was so aptly condemned by the District Court in its Order:

> A theme of Appellants' case is Mr. Pryor's failure to act with "civility" and "professionalism." See, e.g., Defs.' Counsel Cross-examination of Mr. Pryor (Dec. 7, 2022). These accusations are necessarily met with skepticism, as standards of "civility" and "professionalism" have been used as tools of discrimination and to silence opposition. See, e.g., Lynn Mie Itagaki, The Long Con of Civility, 52 Conn. L. Rev. 1169, 1171– 72 (2021) ("We should be deeply suspicious with demands for civility that are often deployed to quell dissent from marginalized populations and to dampen democratic practices."); Leah Goodridge, Professionalism as a Racial Construct, 69 UCLA L. Rev. Discourse 38 (2022). Appellants seek to preserve the "tranquility" of DPS. See Resp. at 19, 24. In short, their focus in these proceedings is on the absence of tension, not the presence of justice.

Aplt.Appx.1332. Appellants have and continue to level these accusations at a Black man who is speaking out regarding the unequal treatment of minority students. The District Court's injunction was necessary to protect Mr. Pryor's First Amendment rights and, therefore, it should be upheld by this Court on appeal.

## 4. **STANDARD OF REVIEW**

This Court reviews a district court's decision to issue a preliminary injunction for abuse of discretion. *See AG of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 775 (10th Cir. 2009). "The standard for abuse of discretion is high. [Appellants] must show that the district court committed an error of law (for example, by applying the wrong legal standard) or committed clear error in its factual findings." *Winnebago Tribe of Neb. v. Stovall*, 341 F.3d 1202, 1205 (10th Cir. 2003). This Court has previously characterized an abuse of discretion as "an arbitrary, capricious, whimsical, or manifestly unreasonable judgment." *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009). "A district court's decision crosses the abuse-of-discretion line if it rests on an erroneous legal conclusion or lacks a rational basis in the record." *Free the Nipple-Fort Collins*, 916 F.3d at 796. Appellants cannot meet this high burden.

5. **ARGUMENT**

    5.1 **Appellants waived any argument that the injunction imposed by the District Court is a "disfavored" injunction.**

For the first time on appeal, Appellants assert that the injunction imposed by the District Court is a "disfavored" injunction. This Court should not consider this argument on appeal because Appellant forfeited it by failing to raise it before the District Court.[3] *See Richison v. Ernest Group, Inc.*, 634 F.3d 1123, 1127-28 (10th Cir. 2011); *Lyons v. Jefferson Bank & Tr.*, 994 F.2d 716, 721 (10th Cir. 1993).

    5.2 **The injunction imposed by the District Court is not a "disfavored" injunction.**

Courts "disfavor" some preliminary injunctions and so require more of the parties who request them. *See Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258-59 (10th Cir. 2005). Disfavored preliminary injunctions don't merely preserve the parties' relative positions pending trial. *Id.* Instead, a disfavored injunction may exhibit any of three characteristics: (1) it mandates action (rather than prohibiting it), (2) it changes the status quo, or (3) it grants all the relief that the moving party could expect from a trial win. *Awad v. Ziriax*, 670 F.3d 1111, 1125 (10th Cir. 2012) (citing *Summum v. Pleasant Grove City*, 483 F.3d 1044, 1048-49 (10th Cir.

_____

[3] However, even if this Court considers these arguments, they are unavailing as demonstrated *infra* **Section 5.2**.

2007)); *see also Phillip v. Fairfield Univ.*, 118 F.3d 131, 133 (2d Cir. 1997) (explaining that an injunction is "mandatory" if "its terms would alter, rather than preserve, the status quo by commanding some positive act"). None are true here.

First, the injunction merely prohibits action: it simply proscribes retaliation by Appellants. Second, the injunction does not alter the status quo. The status quo is "the last peaceable uncontested status existing between the parties before the dispute developed[.]" *Free the Nipple-Fort Collins*, 916 F.3d at 798 n.3. Here, the status of the parties before the imposition of the Ban Letter and retaliation by Appellants is the last peaceable uncontested status existing between the parties which the injunction merely preserves. Third, the injunction does not grant all of the relief that Appellee could expect to win at trial. This lawsuit, in addition to seeking injunctive relief, also seeks damages. Also, the all-the-relief category only applies to injunctions that "once complied with, cannot be undone[.]" *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1246-50 (10th Cir. 2001). Here, this Court can "put the toothpaste back in the tube" after trial is the injunction is undone; if Appellees lose on the merits after trial, then Appellants may fully enforce the Ban Letter. *Free the Nipple-Fort Collins*, 916 F.3d at 798 n.3. Accordingly, Appellants' arguments that Appellee must meet the heightened standard applied to disfavored injunctions fail.

5.3 **The District Court did not abuse its discretion in concluding that Appellee has shown a substantial likelihood of success on the merits.**

5.3.1 **The District Court correctly concluded that the First Amendment analysis applied to non-employee speech should be used to analyze Mr. Pryor's First Amendment claims.**

This Court has clearly stated that the *Garcetti/Pickering* "test quite properly applies to claims brought by government employees - but its scope reaches no further." *Van Deelen v. Johnson*, 497 F.3d 1151, 1156 (10th Cir. 2007). The *Garcetti/Pickering* analysis "was meant to form a sphere of protected activity for public employees, not a constraining noose around the speech of private citizens." *Van Deelen*, 497 F.3d at 1156. As this Court has stated, "it is the government's powers and responsibilities as an employer that warrant restrictions on speech," including those formulated in the *Garcetti/Pickering* analysis, "that would not be justified in other contexts." *Worrell v. Henry*, 219 F.3d 1197, 1210 (10th Cir. 2000); *McCook v. Springer Sch. Dist.*, 44 F. App'x 896, 903 (10th Cir. 2002) (applying the non-employee First Amendment standard articulated in *Worrell* to parents of a high school student who criticized school administrators and were retaliated against because of that criticism). Recently, this Court refused to extend the *Garcetti/Pickering* analysis to "every individual who plays a so-called 'critical' role in some part of the government" because doing so "would have disastrous downstream results[.]" *Peck v. McCann*, 43 F.4th 1116, 1135 n.11 (10th

Cir. 2022). Other Circuits have similarly held that expanding the *Garcetti/Pickering* analysis beyond the context of employee speech "into the broader context of all citizen speech would wrench it from its original rationale and curtail a significant body of free expression that has traditionally been fully protected under the First Amendment." *Eichenlaub v. Twp. of Indiana*, 385 F.3d 274, 282 (3d Cir. 2004); *Jenkins v. Rock Hill Local Sch. Dist.*, 513 F.3d 580, 587 (6th Cir. 2008); *Campagna v. Mass. Dep't of Envtl. Prot.*, 334 F.3d 150, 155 (1st Cir. 2003); *Friedl v. City of New York*, 210 F.3d 79, 87 (2d Cir. 2000); *Vickery v. Jones*, 100 F.3d 1334, 1346 n.1 (7th Cir. 1996); *United States v. Reyes*, 87 F.3d 676, 680 (5th Cir. 1996); *see also Coleman v. Cerski*, No. 3:04-cv-1423, 2007 U.S. Dist. LEXIS 74347, at *23-24 (M.D. Pa. Oct. 4, 2007) (applying the non-employee First Amendment analysis to claims of retaliation by a volunteer Fire Police member).

Appellants concede that that Mr. Pryor is not a DPS employee. **Opening Brief**, p. 2; Aplt.Appx.2099,2118,2126. And the relationship between Mr. Pryor and DPS "does not resemble an employment relationship" as the only ties between DPS and Mr. Pryor are his roles as a volunteer football coach and founder of the STEAM Academy. *CarePartners LLC v. Lashway*, 545 F.3d 867, 881-82 (9th Cir. 2008). Mr. Pryor, instead, is a community activist and advocate who works, and speaks out, on educational issues. Further, Mr. Pryor's complaints "do not

resemble ordinary workplace grievances[.]" *Id.* at 881-82. Mr. Pryor raised

complaints about the actions of DPS generally and, even when his complaints

related to DPS' treatment of STEAM Academy or the FNE Warriors, his concerns

were not simply about issues with his role as a volunteer football coach and

founder of the STEAM Academy. Ultimately, "[s]ince the reason for the test is

missing in the present case -- maintaining order in the governmental workplace --

the [*Garcetti/Pickering* analysis] should not be applied here." *Gable v. Lewis*, 201

F.3d 769, 771 (6th Cir. 2000).

> ### 5.3.2 The District Court did not abuse its discretion by holding that, even under the more stringent First Amendment analysis applied to speech by public employees, Mr. Pryor demonstrated a likelihood of success that Appellants violated his First Amendment rights.

"[C]itizens do not surrender their First Amendment rights by accepting

public employment." *Lane v. Franks*, 134 S. Ct. 2369, 2374 (2014). In fact,

"[t]here is considerable value . . . in encouraging, rather than inhibiting, speech by

public employees," because "government employees are often in the best position

to know what ails the agencies for which they work." *Id.* at 2377. To state a claim

for a First Amendment violation in the public employment context, courts **balance**

the following factors:

> (1) whether the speech was made pursuant to an employee's official duties;
> (2) whether the speech was on a matter of public concern; (3) whether the
> government's interests, as an employer, in promoting the efficiency of the
> public service are sufficient to outweigh the plaintiff's free speech interests;

(4) whether the speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct.

*Eisenhour v. Weber County*, 744 F.3d 1220, 1227-28 (10th Cir. 2014). "The first three elements are issues of law for the court to decide, while the last two are factual issues[.]" *Knopf v. Williams*, 884 F.3d 939, 945 (10th Cir. 2018). Appellants seemingly do not contest the District Court's decision that the first, second, fourth, and fifth factors weigh in Plaintiff-Appellant's favor, *see* **Opening Brief**, pp. 33-40, likely because there is no non-frivolous basis to do so. The fact that there is no argument that four of the five factors weigh heavily in Mr. Pryor's favor, standing alone, is enough for this Court to affirm the District Court's ruling. However, as outlined below, all of these factors weigh heavily in Mr. Pryor's favor, including the disputed third factor.

5.3.2.1 <u>The District Court correctly found that Mr. Pryor's advocacy was not made pursuant to his official duties.</u>

Although this Court has "refrained from establishing per se rules for determining whether speech is made pursuant to an employee's official duties," its precedent indicates that speech generally falls outside an employee's official job duties and is thus protected under this first element of *Garcetti* if (1) the matter on which the employee speaks is not within the employee's assigned responsibilities, and (2) the employee has no duty to report to the person or entity with whom the employee discusses the issue. *Rohrbough v. Univ. of Colo. Hosp. Auth.*, 596 F.3d

741, 747 (10th Cir. 2010); *Davis v. Utah*, No. 20-4042, 2021 U.S. App. LEXIS 26554, at *14 (10th Cir. Sep. 2, 2021).

Here, Mr. Pryor engaged in advocacy as a citizen acting outside the scope of any official duties he may have had as a DPS volunteer and school founder. *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1205 (10th Cir. 2010) (holding that speech was not within the scope of the plaintiffs' official duties in part because the speech occurred outside of work and after hours). Mr. Pryor's responsibilities as a volunteer "did not relate to reporting wrongdoing" to the public or Appellants. *Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ.*, 595 F.3d 1126, 1135-36 (10th Cir. 2010); *Lane*, 134 S.Ct. at 2378. Appellants were outside of any purported chain of command for Mr. Pryor, and he spoke with his elected officials (and to the public through social media) just as any citizen might have done. *See, e.g., Rohrbough*, 596 F.3d at 747; *see also Van Dam v. Town of Guernsey*, No. 20-CV-60-SWS, 2021 U.S. Dist. LEXIS 87070, at *22 (D. Wyo. May 4, 2021). Finally, Mr. Pryor spoke about issues to which any parent of DPS students, or DPS taxpayer, would have the ability to know and care about. Mr. Pryor "was not instructing players, discussing strategy, encouraging better on-field performance, or engaged in any other speech… as a coach." *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2413 (2022). Ultimately, Mr. Pryor's speech may have "concerned his work but [it] was not part of it." *Seifert v. Unified*

*Gov't of Wyandotte Cty.*, 779 F.3d 1141, 1152-53 (10th Cir. 2015). Mr. Pryor's advocacy was not among "the type of activities that [he] was paid to do." *Id*. It was therefore protected speech, and the District Court did not err in concluding as much.

5.3.2.2 <u>The District Court correctly found that Mr. Pryor's advocacy only addressed matters of significant public concern.</u>

"Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Lane*, 573 U.S. at 241 (cleaned up). Government employee speech that exposes wrongdoing or corruption within the employee's own agency lies at "the apex of the First Amendment[.]" *Moser v. Las Vegas Metropolitan Police Department*, 984 F.3d 900, 906 (9th Cir. 2021); *Casey v. West Las Vegas Indep. Sch. Dist.*, 473 F.3d 1323, 1331 (10th Cir. 2007). Importantly, "[g]overnment employees are often in the best position to know what ails the agencies for which they work; public debate may gain much from their informed opinions." *Waters v. Churchill*, 114 S. Ct. 1878, 1887 (1994).

The topics that Mr. Pryor discussed were certainly matters of public concern as Mr. Pryor levied a broad challenge to "pervasive and systematic

misconduct by a public agency or public officials," and raised these concerns in an attempt "to correct allegedly unlawful practices or bring them to public attention." *Saulpaugh v. Monroe Cmty. Hosp.*, 4 F.3d 134, 143 (2d Cir. 1993); Aplt.Appx.1123-24. Given that Mr. Pryor's speech advocated for racial justice within DPS, it certainly is at the heart of what the First Amendment protects. *Connick*, 461 U.S. at 148, n.8; *Locurto v. Giuliani*, 447 F.3d 159, 183 (2d Cir. 2006). In other words, Mr. Pryor's advocacy was not "personal complaints and grievances about conditions of employment.'" *Durham v. Jones*, 737 F.3d 291, 299-300 (4th Cir. 2013); *Berger v. Battaglia*, 779 F.2d 992, 998 (4th Cir. 1985).

Moreover, multiple courts have held that "publicly posting on social media" like Mr. Pryor did here, "suggests an intent to communicate to the public or to advance a political or social point of view beyond the employment context." *Liverman v. City of Petersburg*, 844 F.3d 400, 410 (4th Cir. 2016) (cleaned up); *Hernandez v. City of Phx.*, 43 F.4th 966, 978 (9th Cir. 2022). And the fact that Mr. Pryor's concerns "garnered media attention" also demonstrates that his speech touched on matters of public concern. *Moonin v. Tice*, 868 F.3d 853, 864 (9th Cir. 2017). For these reasons, the entirety of Mr. Pryor's advocacy touched on a matter of public concern, his interest in speaking was weighty, and the District Court did not err in so holding.

### 5.3.2.3 The District Court correctly found that Appellants' interests in regulating Mr. Pryor's speech do not outweigh Mr. Pryor's interest in speaking.

First Amendment rights "are protected 'unless the employer shows that some restriction is necessary to prevent the disruption of official functions or to insure effective performance by the employee.'" *Gardetto v. Mason*, 100 F.3d 803, 815 (10th Cir. 1996). The governmental defendant bears the burden of proof to justify its regulation of speech. *Connick*, 461 U.S. at 150; *Brammer-Hoelter*, 492 F.3d at 1207. "The only public employer interest that outweighs the employee's free speech interest is 'avoiding direct disruption, by the speech itself, of the public employer's internal operations and employment relationships." *Trant v. Oklahoma*, 754 F.3d 1158, 1165 (10th Cir. 2014) (quoting *Brammer-Hoelter*, 492 F.3d at 1207). The employer "cannot rely on purely speculative allegations that certain statements caused or will cause disruption." *Dixon v. Kirkpatrick*, 553 F.3d 1294, 1304 (10th Cir. 2009).

There was no evidence presented at the preliminary injunction hearing that Mr. Pryor's political speech "threatened any of the work" of DPS. *See Casey*, 473 F.3d at 1333; *see also Duda v. Elder*, 7 F.4th 899, 914 (10th Cir. 2021). Mr. Pryor's advocacy did not disrupt operations at DPS. *Moore v. Kilgore*, 877 F.2d 364, 374 (5th Cir. 1989); *Kennedy v. Tangipahoa Par. Library Bd. of Control*, 224 F.3d 359, 378-79 (5th Cir. 2000).

Additionally, speech restrictions on "a high-ranking deputy" are more justifiable than on an employee who "serves no confidential, policymaking or public contact role." *See Rock v. Levinski*, 791 F.3d 1215, 1221 (10th Cir. 2015). As a volunteer, Mr. Pryor's "employment relationship" (if any at all) with Appellants was not "the kind of close working relationship[] for which it can persuasively be claimed that personal loyalty and confidence are necessary to [its] proper functioning." *See Pickering v. Board of Education*, 391 U.S. 563 (1968) at 570; *see also Duda*, 7 F.4th at 914. In other words, Mr. Pryor "was not in management, but was, in contrast, merely an unpaid, volunteer" and, therefore, his speech that was critical of DPS officials that he did not work with on a daily basis was not disruptive. *Buker v. Howard Cty.*, No. MJG-13-3046, 2015 U.S. Dist. LEXIS 68763, at *20-24 (D. Md. May 27, 2015).

Appellants claim that Mr. Pryor was retaliated against, not for the content of his speech, but for his tone and alleged inappropriate conduct. As demonstrated at the hearing, Mr. Pryor engaged in no behavior that could be construed as threatening or violative of DPS policies. Second, there is no legal requirement that a citizen must be polite or courteous or professional when talking to public officials or their elected representatives to voice their concerns about issues of public concern. In fact, this Court's caselaw holds that the *opposite* is true: speech that is profane and discourteous, when directed at elected representatives and

public officials, is protected. *Klen v. City of Loveland*, 661 F.3d 498, 509-10 (10th Cir. 2011).

Moreover, Appellants use of these justifications is simply a heckler's veto by another name, which is "one of the most persistent and insidious threats to first amendment rights[.]" *Berger v. Battaglia*, 779 F.2d 992, 1001 (4th Cir. 1985). This Court has previously held that an employer "cannot justify disciplinary action against [an employee] simply because some members of the public find [the employee's] speech offensive." *Flanagan v. Munger*, 890 F.2d 1557, 1564 (10th Cir. 1989). "Government's instinctive and understandable impulse to buy its peace -- to avoid all risks of public disorder by chilling speech assertedly or demonstrably offensive to some elements of the public -- is a recurring theme in first amendment litigation." *Id.* This Court should not permit appellants to institute this assault on the First Amendment through "executive action responsive to the sensibilities of a minority." *Id.*

Ultimately, as the District Court rightly concluded, the tone policing by Appellants and their accusations that Mr. Pryor failed to act with civility and professionalism "have been used as tools of discrimination[.]" Aplt.Appx.1332. This Court should not entertain Appellants' invitation to utilize these tools of discrimination to justify the curtailing of Mr. Pryor's First Amendment rights.

### 5.3.2.4 The District Court correctly found that Mr. Pryor's speech was a motivating factor for Appellants' retaliatory actions.

Retaliation for exercising one's First Amendment rights need not provide the only reason for the adverse employment action, but it must provide "a substantial or motivating factor." *Gann v. Cline*, 519 F.3d 1090, 1093 (10th Cir. 2008); *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). As established at the preliminary injunction hearing, the Ban Letter was instituted because of Mr. Pryor's speech and the District Court did not abuse its discretion in finding as much. While Appellants attempt to characterize Mr. Pryor's protected speech as "conduct", this distinction falls flat. As outlined above, the "conduct" they reference is speech; it is speech that made them uncomfortable, but protected speech that produces discomfort is equally protected.

Moreover, contrary to Appellants' arguments, "the government may not 'deny a benefit to a person on a basis that infringes his constitutionally protected interests--especially, his interest in freedom of speech'--even though the person has no right to the valuable governmental benefit and 'even though the government may deny him the benefit for any number of reasons.'" *Seamons v. Snow*, 84 F.3d 1226, 1236 (10th Cir. 1996). It is immaterial whether Mr. Pryor had a right to be a volunteer football coach or access STEAM Academy property;

what matters is that he lost his ability to do so because he engaged in First Amendment-protected activity.

### 5.3.2.5 The District Court correctly found that Appellants would not have retaliated against Mr. Pryor absent his advocacy.

As established at the preliminary injunction hearing, Appellants would not have subjected Mr. Pryor to the Ban Letter and the temporary protection order proceedings absent his advocacy. Appellants issued the Ban Letter because of his advocacy and social media postings about Ms. Lynch and others. The District Court did not abuse its discretion in finding that, absent Mr. Pryor's advocacy, the ban letter would have been issued.

### 5.3.3 **Under the First Amendment analysis applied to speech by non-employees, Mr. Pryor has shown a substantial likelihood of success on the merits.**

"[A]s a general matter, . . . government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. American Civil Liberties Union*, 535 U.S. 564, 573 (2002) (cleaned up). And in most cases, a content-based restriction on speech can withstand a First Amendment attack only if it satisfies strict scrutiny: that is, only if the challenged action is narrowly drawn to serve a compelling governmental interest. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 395 (1992); *see also United States v. Strandlof*, 667 F.3d 1146, 1157 (10th Cir. 2012). Mr. Pryor demonstrated a likelihood of success on his First Amendment claim at the preliminary injunction hearing by showing

that he was engaged in First Amendment activity, the restrictions on his speech were content-based, the restrictions were not narrowly tailored to a compelling government interest, and the restrictions would chill a person of ordinary firmness from continuing to engage in protected activity. *See Brandt v. City of Westminster*, 300 F. Supp. 3d 1259 (D. Colo. 2018).

### 5.3.3.1 Mr. Pryor was engaged in First Amendment protected petitioning activity when he directly contacted DPS officials.

"The promise of self-government depends on the liberty of citizens to petition the government for the redress of their grievances." *Van Deelen*, 497 F.3d at 1155. "When public officials feel free to wield the powers of their office as weapons against those who question their decisions, they do damage not merely to the citizen in their sights but also to the First Amendment liberties and the promise of equal treatment essential to the continuity of our democratic enterprise." *Id.* "The very idea of a government, republican in form, implies a right on the part of its citizens . . . to petition for a redress of grievances." *United States v. Cruikshank*, 92 U.S. 542, 552 (1875); *see also United Mine Workers v. Ill. State Bar Ass'n*, 389 U.S. 217, 222 (1967) (The right to petition is "among the most precious of the liberties safeguarded by the Bill of Rights."). "[A] private citizen exercises a constitutionally protected First Amendment right *anytime* he or she petitions the government for redress; the petitioning clause of the First

Amendment does not pick and choose its causes. The minor and questionable, along with the mighty and consequential, are all embraced." *Van Deelen*, 497 F.3d at 1156. Mr. Pryor was engaged in constitutionally protected petitioning activity when he directly spoke with DPS officials and interacted with them on social media.

### 5.3.3.2 Mr. Pryor was engaged in First Amendment protected free speech activity when he criticized DPS and its officials, and spoke out on issues related to DPS.

Political speech or "speech concerning public affairs is more than self-expression; it is the essence of self-government." *Burson v. Freeman*, 504 U.S. 191, 196 (1992) (quotations omitted). "Speech deals with matters of public concern when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public[.]'" *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (quoting *Connick*, 461 U.S. at 145). "[S]peech on public issues occupies the 'highest rung of the hierarchy of First Amendment values' and is entitled to special protection." *Id.* at 444 (quoting *Connick*, 461 U.S. at 145). Appellants subjected Mr. Pryor to the Ban Letter "for his expression of dissatisfaction with the policies of this country, expression situated at the core of our First Amendment values." *Texas v. Johnson*, 491 U.S. 397, 411 (1989).

Moreover, Mr. Pryor engaged in significant speech on social media and courts have consistently held that such speech is protected by the First Amendment. *Utter v. Colclazier*, 714 Fed. Appx. 872, 882 (10th Cir. 2017) (holding that failing to rehire public school substitute teacher because of her "Facebook posts in favor of the bond issue" constituted a claim under the First Amendment); *Liverman v. City of Petersburg*, 844 F.3d 400, 408 (4th Cir. 2016) (finding that "social networking sites like Facebook have [] emerged as a hub for sharing information and opinions with one's larger community" and, because of this, a government policy banning speech critical of the government employer violated the First Amendment); *see also Swanson v. Griffin*, No. 21-2034, 2022 U.S. App. LEXIS 5179, at *8 (10th Cir. Feb. 25, 2022).

### 5.3.3.3 Mr. Pryor engaged in his speech and petitioning activity at public fora.

Mr. Pryor engaged in his speech and petitioning activity in multiple public fora. First, Mr. Pryor engaged in speech and petitioning activity on the internet, specifically on social media. Two decades ago, the Supreme Court described the Internet as "a vast platform from which to address and hear from a worldwide audience." *Reno v. American Civil Liberties Union*, 521 U.S. 844, 853 (1997). In providing "relatively unlimited, low-cost capacity for communication of all kinds," the Internet enables virtually anyone to "become a town crier with a voice that resonates farther than it could from any soapbox." *Id*. at 870. More recently,

the Court identified the Internet—and "social media in particular"—as "the most important place[] . . . for the exchange of views" in contemporary life. *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017). As an instrument for "speaking and listening in the modern public square," social media affords "perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard." *Id.* at 1737. The overwhelming majority of cases that have addressed whether social media provides a public forum for free speech have answered that question affirmatively. *See e.g., Knight First Amendment Inst. at Columbia Univ. v. Trump*, 928 F.3d 226 (2d Cir. 2019) ("*Knight II*"); *Am. Atheists v. Rapert*, No. 4:19-cv-00017-KGB, 2019 U.S. Dist. LEXIS 230493, at *64 (E.D. Ark. Sep. 30, 2019); *Hyman v. Kirksey*, No. 3:18-cv-230-DPM, 2019 U.S. Dist. LEXIS 90509, at *4 (E.D. Ark. May 30, 2019); *One Wis. Now v. Kremer*, 354 F. Supp. 3d 940 (W.D. Wis. 2019); *Price v. City of New York*, No. 15 Civ. 5871 (KPF), 2018 WL 3117507, at *15 (S.D.N.Y. June 25, 2018).

Second, Mr. Pryor engaged in speech and petitioning activity at DPS BOE meetings. Courts have near unanimously held "that a designated public forum exists when a governmental body affords the public an opportunity to address the body at its meeting." *Piscottano v. Town of Somers*, 396 F. Supp.2d 187, 201 (D. Conn. 2005); *Mesa v. White,* 197 F.3d 1041, 1044-5 (10th Cir. 1999). Because Mr. Pryor's speech and petitioning occurred at public fora, any content-based

restriction on his speech is unconstitutional unless narrowly tailored to a compelling government interest. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). It was not.

>    5.3.3.4 <u>Mr. Pryor provided ample evidence that Appellants took action against him because of the viewpoint and content of his speech and petitioning.</u>

Although the Supreme Court has long held that content-based restrictions elicit strict scrutiny, *see, e.g., Carey v. Brown*, 447 U.S. 455 (1980), lower courts diverged on the meaning of "content-based" until *Reed*. *Reed* makes clear that even making "subtle" distinctions as to content subjects an action to strict scrutiny if those "distinctions [are] based on the message a speaker conveys[.]" *Reed* 576 U.S. at 163. Appellants took action against Mr. Pryor because of the content of his speech and petitioning. The content-based nature of the Ban Letter is demonstrated by the fact that Appellants took no such action against a white individual who *actually* threatened a DPS BOE member, but whose speech did not have the same content as that of Mr. Pryor. *See* Aplt.Appx.558 (regarding public statements by white community member who was not censured by DPS).

Moreover, some courts have held that "permitting a heckler's veto is a content-based restriction on speech[,]" *Rock for Life-UMBC v. Hrabowski*, 411 F. App'x 541, 554 (4th Cir. 2010) ("Courts have recognized a heckler's veto as an impermissible form of content-based speech regulation for over sixty years.");

*Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 112 S. Ct. 2395 (1992)

("[l]isteners' reaction to speech is not a content-neutral basis for regulation"),

while other courts have held that the "heckler's veto is… odious viewpoint

discrimination." *Bible Believers v. Wayne Cty.*, 805 F.3d 228, 248 (6th Cir. 2015).

As outlined above, Appellants imposed the Ban Letter as a heckler's veto (the

hecklers being Dr. Hudson, Ms. Lynch, and Ms. Mendez) on Mr. Pryor's speech,

which is at least content-based restriction on speech. Because the decision to take

action against Mr. Pryor was content-based, it violates the First Amendment.

        5.3.3.5 <u>Mr. Pryor demonstrated that the restrictions imposed on his speech were not narrowly tailored to a compelling government interest.</u>

"[T]he government has no legitimate interest in repressing" "ordinary

citizens['] . . . viewpoints on matters of public concern[.]" *Bd. of Cty. Comm'rs,*

*Wabaunsee Cty., Kan. v. Umbehr*, 518 U.S. 668, 680 (1996). "Speech is often

provocative and challenging . . . . [But it] is nevertheless protected against

censorship or punishment, unless shown likely to produce a clear and present

danger of a serious substantive evil that rises far above public inconvenience,

annoyance, or unrest." *City of Houston v. Hill*, 482 U.S. 451, 461 (1987)

(quoting *Terminiello v. Chicago*, 337 U.S. 1, 4 (1949)). The only basis for

instituting the Ban Letter was tone-policing by Appellants. As the record shows,

Mr. Pryor posed no safety threat to Appellants and the only "threats" he made

were to the jobs of the public officials he was criticizing. This is not a narrowly

tailored basis for restricting his speech.

### 5.3.3.6 Appellants' actions would chill a person of ordinary firmness from continuing to engage in First Amendment activity.

Mr. Pryor has shown that "a person of ordinary firmness" would be chilled

by Appellants' actions, which is an objective test. *Smith v. Plati,* 258 F.3d 1167,

1177 (10th Cir. 2001). Courts have routinely held in First Amendment cases that

because "there is no justification for harassing people for exercising their

constitutional rights … [the chilling effect on future speech] need not be great in

order to be actionable." *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982);[4]

*Garcia v. City of Trenton*, 348 F.3d 726, 727-29 (8th Cir. 2003) (holding that two

relatively inexpensive parking tickets was sufficient to deter a person of ordinary

firmness from exercising their rights). The Supreme Court has stated that even an

act as "trivial as failing to hold a birthday party for a public employee … when

intended to punish her for exercising her free speech rights" is actionable. *Rutan v.

Republican Party*, 497 U.S. 62, 76 n.8 (1990).

Appellants "bad faith investigation" and "legal harassment" of him is

enough to chill a person of ordinary firmness from continuing to engage in First

---

[4] The Seventh Circuit's decision in *Bart* is widely cited, in this Circuit and others, as the standard-bearing case on this issue.

Amendment protected speech. *Worrell*, 219 F.3d at 1212. Even the mere threat of official action qualifies as harm sufficient to violate the First Amendment. *Van Deelen*, 497 F.3d at 1157. Appellants' actions would chill a person of ordinary firmness from continuing to exercise their First Amendment rights, and indeed did chill Mr. Pryor. Aplt.Appx.548-54,560-61.

### 5.3.4 **Appellants retaliated against Mr. Pryor in violation of his First Amendment rights.**

The evidence from the preliminary injunction hearing demonstrates that: (1) Mr. Pryor was "engaged in constitutionally protected activity[,]" (2) Appellants' actions caused him "to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity[,]" and (3) that Appellants' actions were "substantially motivated" by Mr. Pryor's engagement in constitutionally protected activity. *Worrell*, 219 F.3d at 1212. As outlined above, Mr. Pryor was engaged in First Amendment activity and Appellants' actions would chill a person of ordinary firmness.

Additionally, Appellants' actions were "substantially motivated" by Mr. Pryor's First Amendment protected activity. In the context of First Amendment retaliation claims, a "motivating factor" is one that is a "sufficient condition" to cause an adverse action. *Greene v. Doruff*, 660 F.3d 975, 977-78 (7th Cir. 2011) (citing *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 287 (1977)). "A sufficient condition is something that, if it is present,

something else is bound to happen[.]" *Id.* To meet his burden a plaintiff does not have to show that that alleged impermissible motive was a "necessary condition" to cause the adverse action. *Id.* In other words, it is not a plaintiff's burden to prove that the impermissible motive was the "but-for" cause of the adverse action. *Id.*[5] The evidence shows that Appellants' actions were specifically premised on Mr. Pryor's protested speech directed at elected officials. Appellants' repeated reference to Mr. Pryor's advocacy in their retaliatory actions is sufficient to demonstrate a causal connection. *See Worrell*, 219 F.3d at 1213-14; *Van Deelen*, 497 F.3d at 1157-58; *DeLoach v. Bevers*, 922 F.2d 618, 620 (10th Cir. 1990).

Additionally, the temporal proximity between Mr. Pryor's protected activity and Appellants' retaliatory actions is sufficient, in and of itself, to allege the causal connection. *See Esparza v. Bowman*, 523 F. App'x 530, 536 (10th Cir. 2013). Almost immediately after Mr. Pryor's advocacy, Appellants issued the Ban Letter. Courts have held that this close proximity is enough to infer retaliatory motive. *Ramirez v. Oklahoma Dep't of Mental Health*, 41 F.3d 584, 596 (10th Cir. 1994); *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999); *Grabow v. Indep. Sch. Dist. No. I-008*, No. 95-6316, 1996 U.S. App. LEXIS 12373, at *10-11 (10th Cir. May 29, 1996).

---

[5] *See also Suppan v. Dadonna*, 203 F.3d 228, 235-36 (3d Cir. 2000); *Quraishi v. St. Charles Cty.*, No. 19-2462, 2021 U.S. App. LEXIS 2379 (8th Cir. Jan. 28, 2021).

### 5.3.5 **Appellants imposed an unconstitutional prior restraint on his speech under the test applied to non-employee speech.**

"The clearest definition of prior restraint is as an administrative system or a judicial order that prevents speech from occurring[.]" Erwin Chemerinsky, *Constitutional Law: Principles and Policies* § 11.2.3.1, at 949-50 (3d ed. 2006). Appellants' decision to impose the Ban Letter instituted prior restraints on Mr. Pryor's speech. *See Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1046 (9th Cir. 2006); *Cmty. for Creative Non-Violence v. Turner*, 714 F. Supp. 29, 33 (D.D.C. 1989). "[P]rior restraints on speech and publication are the most serious and least tolerable infringement on First Amendment rights." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). Importantly, "[prior restraints] must be couched in the narrowest terms that will accomplish the pin-pointed objective permitted by constitutional mandate and the essential needs of the public order." *Carroll v. President & Comm'rs of Princess Anne*, 393 U.S. 175, 183 (1968). Appellants had many options other than completely foreclosing expression by banning Mr. Pryor from DPS property if they truly feared a public safety threat, including (but certainly not limited to) an increased security presence for DPS grounds. The failure to take these or other steps demonstrates that Appellants' actions were not narrowly tailored. *See McCullen v. Coakley*, 573 U.S. 464, 493 (2014).

5.4 **The District Court did not err in concluding that Appellant would suffer an irreparable injury absent the issuance of an injunction.**

It is an undebatable truth in First Amendment jurisprudence that, no matter the forum, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Verlo v. Martinez*, 820 F.3d 1113, 1127 (10th Cir. 2016). "[W]hen an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Awad*, 670 F.3d at 1131; *see also Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014).

Further, "[a] plaintiff suffers irreparable injury when the court would be unable to grant an effective monetary remedy after a full trial because such damages would be inadequate or difficult to ascertain." *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1156 (10th Cir. 2001). It is clear that in this case "[d]amages would be inadequate or difficult to ascertain," *id.* at 1156, as Mr. Pryor's injuries stem from the silencing of his speech. "Dignitary wounds cannot always be healed with the stroke of a pen." *Obergefell v. Hodges,* 135 S. Ct. 2584 (2015) at 2606. This is one of the (many) reasons that courts hold that the violation of the Constitution necessarily constitutes an irreparable injury. *See Free the Nipple-Fort Collins*, 916 F.3d at 806.

Importantly, absent an injunction, Mr. Pryor would continue to be restricted from speaking by the Ban Letter. *See Preston v. Thompson*, 589 F.2d 300, 303 n.3

(7th Cir. 1978) ("The existence of a continuing constitutional violation constitutes proof of an irreparable harm."). Contrary to the caselaw cited by Appellants relating to First Amendment retaliation cases in the employment context, this case involves a proscriptive ban on speech, the Ban Letter, which prevents Mr. Pryor from speaking and chills his future speech. Unlike an employee who is only at risk of losing his job and is at little-to-no risk that his employer can engage in further retaliation, the Ban Letter represents ongoing retaliation against a vocal community advocate and Appellants have demonstrated that they will continue to retaliate against Mr. Pryor in other ways absent an injunction. This proscriptive chilling of speech is the quintessential irreparable injury in a free speech case.

Finally, and most importantly, Appellants state, with no citation to authority, that the violation of First Amendment rights is less important when it occurs in the context of a volunteer's access to public facilities. This argument should be given no credence by this Court given that the constitutional-violation-as-irreparable-injury is the well-established law of this Circuit, no matter the constitutional right at issue (and, as previously outlined, this precedent is particularly strong in the First Amendment context). *Free the Nipple-Fort Collins*, 916 F.3d at 806; *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001); *Awad*, 670 F.3d at 1131. This panel may not overrule this precedent. *United States v. Meyers*, 200 F.3d 715, 720 (10th Cir. 2000).

## 5.5 **The District Court did not err in concluding that the balance of equities weighed in favor of the issuance of an injunction.**

"[W]hen plaintiff is claiming the loss of a constitutional right, courts commonly rule that even a temporary loss outweighs any harm to defendant and that a preliminary injunction should issue[.]" 11A Charles Alan Wright et al., Federal Practice and Procedure § 2948.2. Courts have consistently held that when First Amendment freedoms are threatened, the balance of the equities weighs in the plaintiff's favor. *See Verlo*, 820 F.3d at 1127; *American Civil Liberties Union v. Johnson*, 194 F.3d 1149, 1163 (10th Cir. 1999).

Appellants essentially ask this Court to reweigh and rebalance the harms, which is improper under the abuse of discretion standard. *See Sanders v. Mountain Am. Credit Union*, 621 F. App'x. 520, 527 (10th Cir. 2015). This Court should dispose of this portion of Appellants' argument without reweighing the equities, which the District Court has already weighed, in this matter.

Ultimately, when there has been a showing that there is substantial likelihood that the First Amendment will be violated absent an injunction, the balance of equities favors issuance of an injunction. *See Awad*, 670 F.3d at 1131*; Johnson*, 194 F.3d at 1163.The District Court did not abuse its discretion by following this well-established legal principle, after holding that Mr. Pryor was likely to succeed on the merits of his First Amendment claim.

## 5.6 **The District Court did not err in concluding that the public interest is served by the issuance of an injunction.**

"[I]t is always in the public interest to prevent a violation of a party's constitutional rights." *Awad*, 670 F.3d at 1132. While it is in the public interest to enforce regulations in a manner that complies with the Constitution, even the public's interest in such enforcement must give way to the "more profound and long-term interest in upholding an individual's constitutional rights." *Id.* at 1132. When the government activity that is to be enjoined violates an individual's First Amendment rights, as is the case here, there is an even stronger presumption that the injunction is in the public interest. *See Cate v. Oldham*, 707 F.2d 1176, 1190 (10th Cir. 1983). Simply put, the public interest is not served by the government violating an individual's First Amendment rights. *See Pac. Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1237 (10th Cir. 2005).

Contrary to Appellants' arguments, throughout our nation's history, federal courts have rightly substituted their judgment for that of public officials whose judgment infringes on constitutionally-protected rights. *See Brown v. Board of Education of Topeka*, 347 U.S. 483 (1954). In fact, that is the very purpose of judicial review – to substitute the judgment of the courts for the judgment of other public officials in determining the constitutionality of official action, regulation, and legislation. *See Marbury v. Madison*, 5 U.S. 137 (1803). It was not contrary to the public interest for the District Court to exercise its constitutionally role of

judicial reviewing the actions of government to ensure that the Constitution is followed.

Finally, the public's interest in protecting the guarantees of the First Amendment outweighs any alleged efficiency, safety or security issues Appellants contend are presented by Mr. Pryor's speech. The Fourth Circuit said it best when it stated:

> while it is tempting to hold that First Amendment rights should acquiesce to national security in this instance, our Forefather Benjamin Franklin warned against such a temptation by opining that those "who can give up essential liberty to obtain a little temporary safety, deserve neither liberty nor safety." We take heed of his warning and are therefore unwilling to relinquish our First Amendment protections[.]

*Tobey v. Jones*, 706 F.3d 379, 393 (4th Cir. 2013); *see also Jews for Jesus v. Massachusetts Bay Transp. Auth.*, 984 F.2d 1319, 1324-25 (1st. Cir. 1993). Mr. Pryor asks this Court to follow Benjamin Franklin's maxim and not allow conjectural concerns about safety and security to trump our most sacred constitutional liberties.

### 5.7 The District Court's injunction specifically delineates what conduct is enjoined.

"The well-settled principle that the nature and scope of the remedy are to be determined by the violation means simply that federal-court decrees must directly address and relate to the constitutional violation itself." *Milliken v. Bradley*, 433 U.S. 267, 281-82 (1977). Throughout our nation's history, federal courts have

rightly stepped in to protect constitutional rights by fashioning equitable remedies tailored to the violation. *See Brown*, 347 U.S. at 483. The federal equitable power has reached areas beyond school desegregation as federal courts have used their broad equitable powers to, for example, ensure prisons were not cruelly punishing inmates, *see Hutto* v. *Finney,* 437 U.S. 678 (1978), protect those committed to our country's mental health hospitals, *see Thomas S.* v. *Flaherty,* 902 F.2d 250 (4th Cir. 1990), and eradicate discrimination from public housing, *see Hills v. Gautreaux,* 425 U.S. 284 (1976). The Supreme Court has acknowledged that "the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971); *accord Ramos v. Lamm*, 639 F.2d 559, 586 (10th Cir. 1980). In civil rights matters, "as with any equity case, the nature of the violation determines the scope of the remedy." *Swann*, 402 U.S. at 16; *see also United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 175 (9th Cir. 1987). This broad authority is particularly important when invoked to "bring an ongoing [constitutional] violation to an immediate halt" like the District Court did here. *Hutto*, 437 U.S. at 687 n.9; *see also Keyes v. Sch. Dist. No. 1*, 895 F.2d 659, 670 (10th Cir. 1990).

A preliminary injunction is unacceptably vague only when "the delineation of the proscribed activity lacks particularity or when containing only an abstract

conclusion of law, not an operative command capable of enforcement." *CF&I Steel Corp. v. United Mine Workers of America*, 507 F.2d 170, 173 (10th Cir. 1974) (citing *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1243-44 (10th Cir. 2001)). "Rule 65(d) requires only that the enjoined conduct be described in reasonable, not excessive, detail—particularly in cases . . . when overly precise terms would permit the very conduct sought to be enjoined." *Reliance Ins. Co. v. Mast Constr. Co.*, 159 F.3d 1311, 1316 (10th Cir. 1998); *see also Scandia Down Corp. v. Euroquilt, Inc.*, 772 F.2d 1423, 1431-32 (7th Cir. 1985); *Johnson v. Radford*, 449 F.2d 115, 117 (5th Cir. 1971). In assessing whether an order complies with Rule 65(d), this Court must construe the district court's language "in light of the injunctive order as a whole." *Reliance Ins. Co*,159 F.3d at 1316; *see also Retiree, Inc. v. Anspach*, 660 F. App'x 582, 590 (10th Cir. 2016).

Appellants claim to be unable to understand what is required by the District Court's Order, but "[i]n this posture it is difficult to term [DPS]'s argument that the injunction is inoperative from lack of specificity as more than self-denying." *Williams v. United States*, 402 F.2d 47, 48 (10th Cir. 1967); *cf. Drywall Tapers and Pointers, Local 1974 v. Local 530 of Operative Plasterers and Cement Masons Int'l Ass'n*, 889 F.2d 389, 395-96 (2d Cir. 1989).

Contrary to Appellants' assertions, the Order is adequately clear regarding the enjoined conduct. The Order states that "Appellants Denver Public Schools, Superintendent Alex Marrero, and Deputy Superintendent Anthony Smith and Appellants' agents, servants, employees, and attorneys and all others who are in active concert or participation with Appellants are preliminarily ENJOINED from enforcing the terms of the letter written by DPS General Counsel Aaron Thompson dated October 18, 2022, and are further ENJOINED from taking any other retaliatory action against Mr. Pryor, his family, or the STEAM Academy for pursuing this lawsuit." Aplt.Appx.1339.

First, it specifically enjoins Appellants from enforcing the terms of the Ban Letter. Appellants' feigned confusion regarding the effect of the Order on those restrictions later removed are unavailing. The point of the Order is clear: Appellants are prohibited from enforcing *all* of the restriction set forth in the Ban Letter.

Read as a whole, the Order's prohibition against other retaliatory action against Mr. Pryor, his family, or the STEAM Academy for pursuing this lawsuit is also clear. For example, Appellants claim to be unable to ascertain which speech the District Court identifies as protected, even though the Order is peppered with examples of Mr. Pryor's protected speech throughout, and in various places even characterizes Mr. Pryor's different categories of protected speech in summary

form such that DPS cannot fairly claim inability to recognize them as protected. *See, e.g.* Aplt.Appx.1316 ("That speech involved the job performance of DPS employees and ways Mr. Pryor believed DPS was failing students"); Aplt.Appx.1329-30 ("These posts discuss the hiring of school staff, the perceived need for school employees to resign or be terminated, the possibility that a school football team had their game purposefully stolen, the inadequacy of the STEAM Academy's facility, and other sensed mistreatment of the community… Mr. Pryor's speech undoubtedly involves matters of public concern because was directed at revealing official shortcomings in the public school system and pushing administrators to do better."). Far from creating confusion, the District Court's acknowledgement that "not all of Mr. Pryor's speech presented in this case would fall under the umbrella of protected speech," Aplt.Appx.1330, demonstrates that it engaged in a thorough analysis, specifically identified the types of speech that *do* fall under the umbrella of protected speech, and explicitly allowed Appellants to restrict any non-protected speech where constitutionally allowed: "His conduct not involving protected speech may form the basis for [Appellants] to place some restrictions on him. Similarly, where [Appellants] can show clear violations of DPS Policies and narrowly tailor the restrictions imposed, its decisions will not suffer from the same infirmities." Aplt.Appx.1338.

Appellant's current complaint that the District Court's Order does not direct DPS how *not* to violate the law similarly misses the mark. First, Appellants' argument is wrongly premised on the notion that Mr. Pryor's protected speech criticizing DPS is "harassment," even after the District Court's 33-page decision explaining otherwise. In addition, Rule 65(d) does not require that the moving party predict all the future ways a retaliatory actor may continue to violate the law in outlining the enjoined conduct, and courts have noted instances in which "the more specific the order, the more opportunities for evasion ('loopholes')." *Clearone Communs., Inc. v. Chiang*, 670 F. Supp. 2d 1248, 1282 (D. Utah 2009) (quoting *Scandia*, 772 F.2d at 1431). Here, the District Court's order explains precisely how Appellants can go about their business while avoiding further violations of Mr. Pryor's constitutional rights. As the District Court held:

> DPS is not left without legitimate remedies to protect its interests and address the conduct of Mr. Pryor and that of other community members, parents, and volunteers. But clumsy and imperious actions that violate the rights of expression under the First Amendment are not permissible.

Aplt.Appx.1334.

Moreover, beyond Appellants' initial constitutional violations outlined during the preliminary injunction hearing, Appellants have continued to retaliate against Mr. Pryor, his family, and the STEAM Academy in a variety of ways so far reaching that it would be impossible for the District Court to predict and specifically enumerate each of them. By way of example, on the morning of

December 14, 2022 – during the course of the seven-day preliminary injunction hearing – Mr. Pryor learned that DPS was in the process of taking steps to relocate the STEAM Academy to the site of Barrett Elementary[6] from the Far Northeast where it had been located specifically so that students would not need to travel outside of their neighborhood to attend a high quality school. Aplt.Appx.1300-01, 2055-56 (specifying school location in the "Far Northeast"). This timing was no coincidence; it was calculated to ensure that both Mr. Pryor and Ms. Pryor – the school's founders – would be unable to either engage with the school board or community members regarding the planned move. Specifically, while Mr. Pryor was (a) banned from DPS, (b) unable to be present on any DPS property, and (c) both he and Ms. Pryor were in the hearing for this preliminary injunction – and thus unable to discover or respond to their actions – DPS Defendant Marrero and DPS staff surreptitiously took steps to cause STEAM Academy to be relocated, and set a school board vote regarding the relocation to take place on December 15, 2022. As Mr. Pryor testified that day during the preliminary injunction hearing, this was retaliation:

> As founders of the school, to have our school moved from the community that we designed it to be in, for this to be going up for a board vote tonight and we haven't been communicated with as school

---

[6] Fittingly, Barrett Elementary was at the center of the DPS's troubling racist history, having been deliberately "built and opened as a segregated school" by DPS in 1960. *Keyes v. Sch. Dist.*, 303 F. Supp. 289, 290 (D. Colo. 1969); *Keyes v. Sch. Dist.*, 413 U.S. 189, 192, 93 S. Ct. 2686, 2689 (1973).

> founders, as parents -- our parents in our school community, our
> students in our school community, now, what this will do, the majority
> of our students live in the Far Northeast. If you move our facility to
> Park Hill east side, 29th and Colorado, our enrollment will diminish.
> And DPS tried to close 10 schools because of declining enrollment a
> couple weeks ago. So this to me is further retaliation against me
> speaking out in an attempt to try to close the Robert F. Smith STEAM
> Academy by moving it from the Far Northeast to 29th and Colorado
> and Barrett Elementary School.

Aplt.Appx.1301. Indeed, on December 15, 2022, while Mr. and Ms. Pryor were

unable to do anything to alert the community or even attend the meeting

themselves, Appellants proceeded to present, vote on, and approve the relocation

of the STEAM Academy. Aplt.Appx.1773-76. As this Court has made clear,

> Rule 65(d) does not require the impossible. *See Reliance Ins. Co. v.*
> *Mast Constr. Co.*, 159 F.3d 1311, 1316-17 (10th Cir. 1998) ("'There is
> a limit to what words can convey. . . . The right to seek clarification or
> modification of the injunction provides assurance, if any be sought, that
> proposed conduct is not proscribed.'") (quoting *Scandia Down Corp. v.*
> *Euroquilt, Inc.*, 772 F.2d 1423, 1431-32 (7th Cir. 1985)); *see*
> *also Johnson v. Radford*, 449 F.2d 115, 117 (5th Cir. 1971) ("A
> temporary injunction is intended to be temporary, to meet the
> exigencies of the situation, and necessarily at times lacks the degree of
> precision which may be required on final decree.").

*Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1243-44 (10th Cir.

2001). If Appellants remain unable to ascertain what constitutes speech on matters

of public concern, or to understand what conduct is proscribed by the First

Amendment and the District Court's injunction, they may seek appropriate

clarification. Their claimed inability to understand these points are not a

justification for staying this Court's decision.

Finally, Appellants' argument that complying with the preliminary injunction would be difficult is no basis for determining that the District Court abused its discretion. "The First Amendment is often inconvenient. But that is beside the point. Inconvenience does not absolve the government of its obligation to tolerate speech." *Int'l Socy'y for Krishna Consciousness v. Lee*, 505 U.S. 672, 701 (1992) (Kennedy, J., concurring); *see also First Unitarian Church of Salt Lake City v. Salt Lake City Corp.*, 308 F.3d 1114, 1129 (10th Cir. 2002). Simply because Appellants may encounter some speculative difficulty in implementing the District Court's Order does not mean the District Court abused its discretion.

6. **CONCLUSION**

Mr. Pryor respectfully requests that this Court affirm the District Court's preliminary injunction order.

DATED this 20th day of July 2023.

KILLMER LANE & NEWMAN, LLP

*/s Andy McNulty*

_____
Mari Newman
Andy McNulty
1543 Champa Street, Suite 400
Denver, CO 80202
(303) 571-1000
(303) 571-1001 (fax)
mnewman@kln-law.com
amcnulty@kln-law.com

*Counsel for Plaintiff-Appellee*

## **STATEMENT REGARDING ORAL ARGUMENT**

Counsel for Plaintiff-Appellee believe oral argument is necessary and will be helpful for the Court due to the legal and factual complexities of this case.

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

1. This document complies with the Length Limits requirement of Fed. R. App. P. 32(a)(7)(B) **AND** <u>this Court's July 14, 2023 Order extending the length of this Brief to 15,000 words</u> because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

    [X] this document contains **14, 966** words, or

    [ ] this brief uses a monospaced typeface and contains <state the number of> lines of text.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    [X] this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font, or

    [ ] this document has been prepared in a monospaced typeface using <state name and version of word processing program> with <state number of characters per inch and name of type style>.

    DATED this 20th day of July 2023.

<div align="right">

KILLMER, LANE & NEWMAN, LLP

*s/ Andy McNulty*

_____
Mari Newman
Andy McNulty
1543 Champa Street, Suite 400
Denver, CO 80202
(303) 571-1000
(303) 571-1001 (fax)
mnewman@kln-law.com
amcnulty@kln-law.com

*Counsel for Plaintiff-Appellee*

</div>

## CERTIFICATE OF SERVICE

I hereby certify that on July 20, 2023, I electronically filed the foregoing with the Clerk of the Court using the PACER system, which will send notification of such filing to the following:

Andrew D. Ringel
Jared R. Ellis
Katherine N. Hoffman
Hall & Evans, LLC
1001 17th Street, Suite 300
Denver, CO 80202
(303) 628-3355
ringela@hallevans.com
ellisj@hallevans.com
hoffmank@hallevans.com

*Counsel for Defendants*

<div style="margin-left:40%">

KILLMER, LANE & NEWMAN, LLP

*s/ Jesse Askeland*

_____
Jesse Askeland

</div>